## PHELPS *v.* HOLDERNESS.

### Opinion delivered June 11, 1892.

1. *Gambling contract—Intention of parties.*

   When parties enter into a contract for the apparent sale and delivery of cotton, but with the intention of adjusting the profit or loss by the rise or fall of the price of the commodity without its actual delivery, the transaction is a gambling venture, and the contract will not be enforced.

2. *Cotton futures—Advances by broker not recoverable.*

   A broker who makes such a contract for a customer for a commission is a *particeps criminis*, and cannot recover money advanced for the customer to make good his loss.

3. *Gambling contract—Case stated.*

   Plaintiffs sued defendant for money advanced by them as his brokers for the purchase of cotton. The correspondence between the parties showed that plaintiffs were willing to buy or sell cotton for defendant at their own risk, without inquiry as to his financial ability, so long as he put up the necessary "margins;" that when he failed to advance further funds, plaintiffs, without offering to deliver the cotton purchased and demanding the price, promptly "closed out" the contract and demanded the difference between the contract and the market price. Defendant testified that it was never his intention to receive or deliver any cotton. *Held,* That the evidence justified a finding that the contract was a gambling transaction, and plaintiffs can recover no losses incurred in forwarding it.

Appeal from Dallas Circuit Court.

CARROLL D. WOOD, Judge.

William A. and Ashton Phelps, as surviving partners of the firm of John Phelps & Co., sued A. S. Holderness upon an open account for money paid out and advanced for defendant at his instance and request. Denfendant denied the indebtedness, alleged that the advances were made without authority from him, and that the advances were "for a simple speculation in cotton market results, and never contemplated any delivery of said cotton, but was simply a wager, contrary to law,

and cannot be enforced, because against a criminal pro-
hibitory statute and against public policy."

William A. Phelps, one of the plaintiffs, testified as
follows: "On December 14, 1885, our firm bought,
through Messrs. Emmett & Purch, brokers, for account
of A. S. Holderness, three hundred bales of cotton for
delivery in April, 1886, at 9 27-100 cents. This purchase
was made by the order of A. S. Holderness, contained in
a letter addressed to our firm, dated December 12, 1885.
This letter contained a check for .$600 for original mar-
gin. * * * On February 6, 1886, the market having
declined to such an extent as to exhaust the original
margin of $600, our firm sent a telegram to A. S. Holder-
ness, asking for an additional margin of $400, to which
he responded February 8, 1886, by remitting a check for
that amount. On February 18, 1886, a further decline
having occurred, our firm again telegraphed him, quot-
ing the market and calling on him for a further margin
of $300. Our firm did not get a reply to this dispatch
until the following day, when we received a telegram
reading as follows: ' I have decided to advance no more
margins on futures.' Upon receipt of said telegram our
firm immediately instructed our brokers, Messrs. Emmett
& Purch, to close out the April contract, which they did
at once at 8 42-100 cents. From the time my firm tele-
graphed him, on February 18, 1886, to the time our firm
received his reply, on the afternoon of February 19, 1886,
there was a further decline of twelve-hundredths of a
cent. Our firm closed out the contract under rule 29 of
the Cotton Exchange, governing transactions in cotton
for future delivery. Our firm were responsible to
Emmett & Purch for whatever loss might have resulted
and which did result in a loss of $1212.05. The amount
of our claim against A. S. Holderness consists of $1212.05,
less margin furnished by him, $999.50, leaving balance
due of $212.55."

The correspondence between the parties was made a part of the plaintiffs' evidence, and is as follows :

"FORDYCE, ARK., December 4th, 1885.
"MESSRS. JOHN PHELPS & Co., NEW ORLEANS.

"I have an idea of investing in futures to the amount of two or three hundred bales of cotton, and as I have never thought of engaging in the business before, I am not posted in it. If I decide to deal in futures, I wish to operate through your house, and would be glad to have you answer the following questions :

"First—What amount of money per bale will I have to advance on April or May futures?

"Second—Has the buyer the right to close out any time during the month the futures are bought for? If not, at what time during the month?

"Third—Is the commission the same as it would be for handling spots?

"Fourth—Will St. Louis exchange pass with you at par? If not, at what discount?

"Fifth—What is your opinion about the future of cotton?

"Any other information about the business will be appreciated by one of your former patrons.

"Yours very truly,
"A. S. HOLDERNESS."

On December 7th Phelps & Co. answered as follows :

"We have your favor of the 4th instant. We answer your questions relative to futures in their order.

"First—We require an original margin of two dollars per bale at the time of making the purchase ; in case the market declines, additional margins to keep it good.

"Second—You can close out at any time you wish.

"Third—We charge $25 per 100 bales for buying or selling, covering both transactions.

"Fourth—Exchange on St. Louis will be at a small discount at this season.

"Fifth—The course of the market is uncertain at present; it looks as if it would go still lower.

"We do not advise any one to buy or sell futures, as it is not a good thing for any one engaged in a regular business."

On December 12th Holderness replied as follows:

"Enclosed please find sight draft on Allen, West & Co., St. Louis, Mo., for six hundred ($600) dollars, which you will please invest in cotton futures for the month of April."

On December 14th Phelps & Co. telegraphed in answer.

"Bought three hundred Aprils, nine twenty-seven hundredths."

And wrote as follows:

"We have your favor of 12th inst., with draft of J. E. Hampton on Allen, West & Co., St. Louis, $600, remitted as margin and now buy for your account 300 B. cotton for April delivery, 9 27-100. We understand that you want to buy as many April contracts as $600 will serve as the original margin for. If our action is not approved, telegraph on receipt of this. When you want to close out, you had better use the wires. The mails are too slow for that kind of business."

To which, on December 17th Holderness replied:

"Yours of the 14th to hand. In reply, you acted as we intended for you to with the $600 remitted as margins. Would be glad for you to keep us posted by sending us weekly the New Orleans Cotton Exchange market report."

On February 6th, Phelps & Co. telegraphed Holderness:

"Remit four hundred dollars additional margin. Advise by wire."

On the 7th Holderness telegraphed in answer: "I will send four hundred dollars additional margin to-morrow." And on February 8th wrote as follows: "In accordance with your instructions of the 6th by wire, which reached me on Sunday, I enclose to you sight draft on Geo. Taylor & Co., St. Louis, Mo., for four hundred dollars as additional margins."

On February 18th, Phelps & Co. telegraphed to Holderness:

"Aprils, eight fifty-four. Remit three hundred dollars margin. Answer."

And on February 19th, Holderness answered:

"I have decided to advance no more margins on futures."

Plaintiffs also read in evidence the deposition of Thos. J. Semmes, a practicing lawyer in the City of New Orleans, to prove the law of Louisiana in regard to contract, for future delivery, who testified as follows:

"That the laws of Louisiana as to contracts for future delivery is settled by the Supreme Court of Louisiana in the case of *Conner & Hall* v. *Robertson*, reported in the 37th Annual, pp. 818 and 819; that in that case the court says: 'The law is now perfectly settled, that an executory contract for the sale of goods for future delivery is not infected with the quality of a wager by reason of the fact that, at its date, the vendor had not the goods, and had not entered into any arrangement to provide for them, and had no expectation of receiving them unless by subsequently going into the market and buying them.' They also say that wagering contracts are void, but the illegal intent to wager under the guise of a contract, 'in order to affect the contract, the alleged illegal intent must have been mutual, and the intent of one party, not communicated to or concurred in by the other, will not avail."

In testifying in his own behalf, Holderness admits the genuineness of the letters and telegrams attached to Phelps' deposition, recites the facts in regard to the purchase substantially as stated by Phelps, denies their authority to make advances for him, and alleges that the transaction was a wager on the price of cotton. On this latter point he says:

" When I first went into the matter I knew nothing about it. It was a mere venture. I did not then know that it was regarded as gambling, but afterwards learned that it was. I never intended to risk more than a thousand dollars. I never at any time directed the plaintiffs to advance any money for me, and don't know whether they ever did advance any for me, but if they did, they did it at their own instance and not at mine. There never was any intention in the transaction that there should be any cotton delivered. It was a purchase of futures, in which it was a bet or wager on the future price of cotton. The whole thing was a speculation in cotton futures, and it was in no sense ever expected that it should in any sense take the course of a spot transaction. The plaintiffs never offered me any cotton ; never made a tender of the cotton, nor ever intimated to me that they would do so. If they had tendered me the cotton itself, I don't know whether I would have been bound to take it or not." * * * " I don't know who plaintiffs bought the cotton from, and don't know whether the seller expected to deliver it or not."

The cause was submitted to the court without a jury. The court found that the defendant never authorized the plaintiffs to advance any money for him ; that the money paid out by plaintiffs was $212.05 ; that this money was advanced for the purpose of sustaining margins for 300 bales of cotton in a future contract in which there was to be no delivery of the cotton in question.

Upon the findings judgment was for defendant. Plaintiffs have appealed.

*Mark Valentine* for appellant.

1. Phelps & Co. were authorized to make the advancements as the agents of appellee, and the loss should fall on the principal.

2. The contract was not a wager or gambling. 108 U. S. 269 ; 110 U. S. 509 ; 37 La. An. 819.

*Met L. Jones* and *H. G. Bunn* for appellee.

1. The evidence shows clearly that no cotton was intended to be delivered, or offered to be delivered; it was simply a gambling contract. 47 Ark. 192; 5 McCrary, 80; 38 Mo. App. 383 ; 6 Cent. L. J. 229 ; 110 U. S. 509 ; 45 N. W. Rep. 304; 18 Atl. Rep. 797 ; 19 *id.* 1084 ; 13 S. W. Rep. 1076 ; 25 Ill. 534; 36 Ill. 179 ; 47 N. W. Rep. 1001.

2. There is no proof that appellants ever paid the amount claimed.

COCKRILL, C. J. Phelps, a broker, sued Holderness for money advanced and expended by the former at the latter's request. The court found especially that the transaction out of which the suit grew was a wager on the rise and fall of the price of cotton.

If that conclusion is sustained by the evidence, there could be no recovery, and the judgment is right.

The testimony of Holderness and the correspondence between him and Phelps justify the conclusion that Holderness desired to try his fortune in the cotton market with no intention of selling or buying, receiving or delivering, a bale of cotton, and that Phelps viewed the transaction in that light.

But there is no direct testimony of the terms of the contract of purchase which Phelps claims to have made for Holderness, and it is argued that, in the absence of proof that Holderness' vendor participated in his illegal design, the contract must be held to be valid. But the

assumption that there is no proof of the vendor's partic-
ipation in Holderness' illegal design, and the conclusions
deduced therefrom, are foreign to the controversy. The
controversy does not arise between the supposed vendor
and Holderness, but between the latter and Phelps.
According to the ruling in some of the States, Phelps,
upon the evidence adduced, might be said to be Holder-
ness' vendor. *Flagg* v. *Baldwin*, 38 N. J. Eq. 229.

But treating him as agent, as his counsel does, and
Holderness as his principal, the cause stands thus, or at
least the court might have found that it was thus: The
principal instructs his broker to make a wager for him
on the price of cotton. The broker replies that he has
followed instructions. A controversy arises between the
two. In that case there is no presumption in favor of
the broker to the effect that he in fact deviated from his
instructions and entered into a contract for the actual
delivery of cotton. Until he has proved the contrary,
the fair inference from the facts is that he made a wager-
ing contract for his principal.

We have assumed that the transaction between
Phelps and Holderness was a mere cover for a gambling
operation. Whether it was so depends upon their inten-
tion at the inception of the contract, and that was a
question of fact. That the court was warranted in its
deduction that it was a gambling device may be seen
from Holderness' testimony and the correspondence be-
tween him and Phelps.

Holderness testifies that it was never his intention
to receive or deliver any cotton. The correspondence
shows that Phelps was willing to buy or sell at his own
risk an unlimited quantity of cotton for Holderness,
without any inquiry as to his financial ability to meet
the obligations he might enter into, provided only
Holderness would put up the necessary "margins."

That is a circumstance tending to show that he did not understand Holderness' offer to deal through him in "futures" upon "margins," as a *bona fide* proffer to buy cotton for actual delivery. *Cobb* v. *Prell*, 5 McCrary, 80 and note.

The subsequent steps taken by him in order to protect himself from liability, in pursuance of the contract which he made, tend to sustain that theory. When Holderness' margin was absorbed, demands for additional margins were made by Phelps, and when at last Holderness declined to furnish any more funds, nothing was said about delivering the supposed cotton and demanding the price, as in a contract to deliver the commodity sold, but he was promptly "closed out" and a demand for the difference between the contract and market prices was made upon him. It is that difference that is the subject of this suit. These facts and circumstances afford evidence of a contract for the payment of the difference between the rise and fall in the price of cotton. A venture upon the turn of prices of any commodity is simply gambling—gambling of the same sort as a venture upon the turn of a card. The radical difference between the two is the method of the deal only.

Phelps was privy to the gambling contract—a *particeps criminis*—and can recover no losses incurred in forwarding the transaction. *Fortenbury* v. *State*, 47 Ark. 188 ; *Irwin* v. *Williar*, 110 U. S. 499.

Affirm.