JOHNSTON *v.* MILLER.

Opinion delivered November 18, 1899.

1. GAMBLING—DEALING IN MARGINS.—Evidence that an alleged indebtedness was for advances made in furtherance of dealings in margins on cotton is not sufficient to prove the transaction a gambling one, undei Sand. & H. Dig., ? 1634, providing that "the buying or selling, oi otherwise dealing in what is known as futures, either in cotton, grain, or anything whatsoever, with a view to profit, is hereby declared to be gambling." (Page 176.)

2. SAME.—The fact that a broker purchased 500 bales of cotton, to be delivered in the future, for one whom he knew to be financially unable to pay for them at the time the contract was to close, and the further fact that the buyer notified the broker that he was buying the cotton merely for the profit he might make out of the transaction, are not sufficient to show a knowledge on the broker's part that the transaction was a speculation on the turn of the market, without actual delivery being contemplated. (Page 180.)

Appeal from Crawford Circuit Court.

JEPHTHA H. EVANS, Judge.

*Oscar L. Miles*, for appellant.

By sending the order to appellant, appellee conferred upon him the right to deal according to the rules and usages of the New York Cotton Exchange, and such rules and usages enter into the contract of sale in this case. 149 U. S. 481. The burden was on appellee to show that the contract was a gambling transaction, and that both parties so understood the transaction. *Ib.* The appellee is bound to repay appellant for his necessary losses and expenditures incurred in the performance of the agency. *Ib.* Further on the point that the gambling intent must be mutual, see 79 Ill. 351; 36 Fed. 54; 6 Mo. App. 269; 108 U. S. 269; 30 Fed. 197.

*E. B. Pierce*, for appellee.

The question in all such cases as this is the intention of the parties. 47 Ark. 194; 110 U. S. 511. The circumstance that appellant was willing to purchase cotton to the value of $25,000 merely upon the order of a stranger who had deposited only $500, and about whom he knew nothing, raises a strong presumption that no actual purchase and delivery of cotton was contemplated. 3 S. W. 152; 8 Am. & Eng. Enc. Law, 1008. The case at bar does not fall within the rule announced in 149 U. S. 481, because in that case the evidence failed to show that either party intended the contract as a wagering or gambling transaction. In an illegal transaction, the agent can recover neither advances or commissions. 141 U. S. 490; 11 U. S. 499, 510; Story, Ag. §§ 330, 340; 56 Ark. 307. Appellee was the real vendor, and one of the principals in the transaction. 38 N. J. Eq. 229; L. R. 7 H. L. 530. As to application of usages of board of trade, as between the broker and his customer, see: L. R. 7 H L. 802, 828.

BUNN, C. J. This is an action in the Crawford county circuit court, by the appellant, R. J. Johnston, against the appellee, R, J. Miller, for services rendered and money paid out at his request, amounting to the sum of $618.75. The cause was submitted to the court sitting as a jury, and upon the facts

in evidence the court held the law to be with the defendant, and adjudged accordingly, and the plaintiff appealed.

This is a suit, in brief, in which the defense is a dealing in futures, or that the contract was a wagering contract. The defendant, Miller, resided in Arkansas, and authorized the plaintiff, Johnston, a cotton broker in New York City, to buy for him a certain number of bales of cotton, to be delivered in the future, or, as the defendant claims, not in fact to be delivered, but that the differences in values or margins should be kept up until the time set for the pretended delivery, and then the contract to be closed on settlement of this difference, the expenses, and so forth.

The complaint is as follows, viz.: "Comes the plaintiff, R. J. Johnston, and complaining of the defendant, R. J. Miller, says: That on the——day of ————, 1895, the plaintiff, R. J. Johnston, was doing business in the city of New York, as a broker, cotton factor, and commission merchant, and that on that day defendant, in the regular course of business, became indebted to the plaintiff in the sum of $618.75; that defendant became so indebted to the plaintiff for labor done, services rendered, and for money paid out by plaintiff during the month of ————, 1895, at the instance and request of defendant; that such sum is now due and unpaid. Wherefore plaintiff prays that he have judgment for said sum of $618.75, and his costs in this behalf laid out and expended."

And the defendant answered as follows, viz.: "(1). Now comes the defendant, R. J. Miller, and for his answer to plaintiff's complaint says that he denies that he is indebted to the plaintiff in the sum of $618.75, or in any other sum, and denies that said plaintiff, during the month of ————, 1895, or any other months, rendered him any service, performed any labor for him, or advanced any money for defendant, at his instance and request. (2.) The said defendant says that the claim presented against him by said plaintiff is a false charge, made solely for the purchase of future cotton sold, in which the said R. J. Johnston was never authorized to make advancements or perform any labor for said defendant, and any advancement so made or labor so performed were without authority, and the

same was for a simple speculation in cotton market results, and never contemplated any delivery of cotton, but was simply a wager, contrary to law, and cannot be enforced, because against public policy and contrary to law. (3.) That any advancements so made by the plaintiff were made on his own responsibility and for his own benefit, and without the knowledge or authority of said defendant, and any losses accruing, if any, were caused by carelessness, negligence and lack of skill on the part of said plaintiff. (4.) Said defendant further says that, even if said advances had been made and labor performed for defendant at defendant's request, as alleged by plaintiff (all of which said defendant specifically denies), and if said transaction was not contrary to law and against public policy, the said plaintiff could not recover from said defendant, because, under that theory of the case, said plaintiff was combining within himself the opposite interests of a purchasing agent purchasing from himself without the knowledge or consent of his principal."

It is unnecessary to discuss this last proposition, as the evidence shows the relation of plaintiff to defendant, and the true character of the transaction all through. Whether the contract was a legitimate or illegitimate one, whether it was allowable under or prohibited by the law, it is manifest, in so far as the services rendered and money expended, the value of the same is established by the evidence, and is correctly stated. There is no question on that point, except that it is contended by appellee's counsel that, by reason of the delay of plaintiff in closing out the deal after being instructed to do so, great loss accrued to defendant. The telegram from defendant to plaintiff reached the latter on Sunday evening, and he obeyed it on Monday as soon as the exchange opened, as is shown in the evidence. This can hardly be considered an unreasonable delay, especially in view of the fact that plaintiff had been for some days previously endeavoring to get instructions from defendant but without success.

The evidence shows that this contract was of such a nature that it was not possible for defendant to cease to perform his part of it at any time, and at any stage, and thus relieve him-

self of liability, for in attempting to do so he would probably repudiate the responsibility the plaintiff had properly assumed for him, and such a course would greatly damage plaintiff. The truth is there is really but one question at issue in this case, and that is, whether or not the contract was in fact one made in violation of law, or contrary to public policy, as alleged in the defendant's answer, especially in the second paragraph thereof.

Was the contract in violation of the laws of this state, or contrary to its public policy? Whether or not it was contrary to public policy need not be discussed here, for the question is altogether one of positive law in this state, for we have a statute (Sand. & H. Dig.) on the subject which reads as follows, viz.: "Sec. 1634. The buying or selling or otherwise dealing in what is known as futures, either in cotton, grain, or anything whatsoever, with a view to profit, is hereby declared to be gambling." And the next section of the Digest makes "dealing in futures" a misdemeanor, and fixes the punishment; and it thus devolved upon the courts to declare what is "dealing in futures," under this act.

In *Fortenbury* v. *State*, 47 Ark. 188, which was the first case in this court in which said statute was construed, we said (quoting from the syllabus): "The act of March 30, 1883, to prohibit dealing in futures is not in restraint of trade. It does not prevent contracts for future delivery, when entered into in good faith and with an actual intention of fulfillment, but is intended to suppress mere speculations upon chances, when the grain, cotton, or stocks dealt in exist only in the imagination, and where no delivery is contemplated, but the parties expect to settle upon the difference in the market."

In *Preston* v. *Cincinnati, C. & H. V. R. Co.*, 36 Fed. Rep. 54, it was held that a mere dealing on margins in the board of trade is not sufficient to show a gambling transaction.

It makes little difference what may be the express terms of the contract, for it is the real intention of the parties in carrying it out that becomes the subject of inquiry. Whether a real or fictitious delivery is to be made is what we are endeavoring to discover, for this makes the contract lawful or unlaw-

ful, as the case may be; and this question, of course, can only be determined by the evidence—by the facts in each case.

The evidence in the case at bar shows, substantially, that the defendant, a citizen of Arkansas, desiring to purchase some cotton futures in the city of New York, to be delivered on a future day, entered into a correspondence with plaintiff on the subject, and this correspondence resulted in an agreement between them that plaintiff would buy 500 bales of cotton for defendant, to be delivered in December following, and this was accordingly done, the defendant depositing $500 in the local banks for the purpose of the purchase. This purchase was made under the rules and regulations of the New York Cotton Exchange, which are in conformity to the statute law of that state on the subject of dealing "in futures," the plaintiff being a member of said cotton exchange, and shows that he acted in all things strictly in accordance with its rules and regulations, and the only grounds to conclude that he did not, if there are any, are the facts and circumstances attending the transaction. There does not appear to be any controversy as to whether the New York law is in conflict with ours, so as to render it contrary to our policy to enforce the New York statute. They are substantially the same, so far as we can see. Nor does there seem to be any contention that the rules of the cotton exchange are in conflict with the statute law of that state. This narrows the inquiry to whether or not the parties, taking advantage of the mere letter of the law, have violated its spirit in fact.

At the conclusion of the testimony, the plaintiff asked the court to make the following findings of fact, which the court, in a sense, declined to do, viz.:

"(1.) R. J. Johnston, the plaintiff, was a cotton factor and broker, doing business in the city of New York, as a member of, and on the floor of, the New York Cotton Exchange. All business done by the said Johnston was done in strict conformity with the rules and regulations of the New York Cotton Exchange, and the business done by the said Johnston, as agent of the defendant, R. J. Miller, was done in all respects in

strict conformity with the rules and regulations of the New York Cotton Exchange.

"(2). R. J. Miller is a wholesale grocer, doing business in the city of Van Buren, Ark. On the 30th day of September, 1895, the said R. J. Miller telegraphed to the said R. J. Johnston, in the city of New York, to buy for him (Miller) 500 bales of cotton for future delivery in the month of December, 1895. This telegram gave no specific instructions to said Johnston, but only embodied the request of Miller that Johnston buy for him the said cotton for future delivery in said month of December. This telegram was received by Johnston in the city of New York, and was an order to purchase at the discretion of said Johnston the cotton required. Several other telegrams passed to and fro between the said Miller and the said Johnston, and finally, on October 12th, the said Miller wired positive instructions to said Johnston to buy 500 bales for future delivery in the month of December. This telegram was received by Johnston, and on the opening of the market, the 12th day of October, 1895, he bought on the floor of the New York Cotton Exchange, as 'a member of the New York Cotton Exchange, and from a member of said exchange, for the account of the said Miller, the 500 bales of cotton for future delivery in the month of December, as instructed by Miller.

"(3.) That said Miller, at the time of telegraphing his first order to Johnston, placed in the Citizens' Bank, of Van Buren, Ark., $500 to the credit of said Johnston, to be used by the said Johnston, according to the rules of the New York Cotton Exchange, as a margin for the purpose of covering the possible loss from a decline in the market. The cotton market, after this purchase, fluctuated, rising first and then falling. As the market rose, Johnston telegraphed Miller the situation of the market; as it declined, he again telegraphed Miller the situation of the market. On the 17th of October, Johnston wired Miller that the decline was sharp, and to please deposit an additional margin. This margin he had a right to call for, under the rules of the New York Cotton Exchange. Miller did not reply to this telegram. On October 18th, Johnston again telegraphed Miller that the break was on, to

please deposit additional margin. Miller did not reply to this telegram. On October 19th, Johnston again telegraphed Miller that cotton was declining rapidly, and to please deposit additional margin, and to have the bank telegraph the amount. October 19th was a Saturday, and on Saturday the New York Exchange closes at noon. On October 20th, at night, Miller telegraphed Johnston to sell the 500 bales of December cotton when the margin was exhausted. This telegram reached Johnston on the morning of the 21st, and on Monday morning, as soon as the cotton exchange opened, the said Johnston sold the said cotton for Miller, because on that morning the market had declined to a point much below what was necessary to exhaust the margin which Miller had placed to Johnston's credit originally. The margin was not exhausted on October 17th, and was not exhausted on October 18th, and was not exhausted on October 19th, when the cotton exchange closed at 12 o'clock noon. When the cotton was sold on the instruction of Miller on the morning of October 21st, a loss of $617.65 was incurred by Johnston for Miller's account.

"(4.) The New York Cotton Exchange is a corporation regularly created by an act of the legislature of the state of New York, specifically authorized to deal in cotton and other commodities, both for present and future delivery. The by-laws of the New York Cotton Exchange, fixed by that body in pursuance with the act of the legislature granting its charter, are all authorized by the law of that state, and do not contravene any principle of law or public policy there in force.

"(5.) The rules of the New York Cotton Exchange required that R. J. Johnston, in making this transaction for the account of R. J. Miller, or, in fact, any patron of his, made himself responsible for all losses which might be incurred by reason of any transaction which the said R. J. Johnston made for any customers of his, and in this case the said R. J. Johnston actually lost, without fault on his part, the sum of money sued for, while carrying on the transaction authorized by his principal, R. J. Miller."

Instead of finding as asked by the plaintiff, the court found as follows, to-wit: "The court finds, from the evidence, the

facts to be that the parties to the transaction out of which this suit grows did not, at the time of entering into the agreement, intend, the one to deliver, and the other actually to receive, the 'five hundred Decembers' ordered to be bought, but only contemplated a settlement by margins or differences, or by some method other than by actual delivery and receipt of the cotton, which actual delivery and receipt of cotton was never contemplated by the parties to the transaction."

The findings of fact which the plaintiff asked the court to make appears to us to be a concise and fair statement of the facts in evidence, and we cannot do better than to adopt that statement as substantially correct, which we do to avoid an unnecessary recital of the evidence. Nor do we conclude that the trial court found any objection to the correctness of this statement, but it seemed to have been the theory of the court that it would be better to state only its conclusions upon the facts, which he did as stated above.

The facts show that the plaintiff did nothing except in apparent strict conformity to the rules and regulations of the cotton exchange. Neither does it appear from the testimony that he at least was intending to do otherwise than to conform to those rules and regulations, whatever the defendant may have intended. *Williams* v. *Tiedemann*, 6 Mo. App. 269; *Roundtree* v. *Smith*, 108 U. S. 269; *Bangs* v. *Hornick*, 30 Fed. Rep. 97.

It was sought to be shown that plaintiff intended to violate the law by the fact that he had knowledge of the financial inability of the defendant to pay for as much as the value of 500 bales of cotton at the time the contract should close. But that fact in a case like this argues nothing; for, if the contract was in fact one of actual delivery, the defendant would have had the cotton itself to pay its value at the time or the purchase price thereof, and his financial ability, aside from this, would only have to be sufficient to pay the difference between what he had agreed to pay and what the cotton was really worth when the transaction was closed.

Again, it is contended that the statement of plaintiff, in his correspondence with defendant, that he would make some

money out of the transaction was a circumstance indicating knowledge on the part of plaintiff that the whole thing was a mere gambling scheme. That circumstance could lead to no such conclusion, for the mere making of money is never an evidence that the method of making it is unlawful.

Our attention is called to the doctrine of *Phelps* v. *Holderness*, 56 Ark. 300. The evidence in that case showed plainly that Holderness was merely speculating on the margins, and never expected any real delivery to be made. This is what Miller says of himself in the case at bar, but the intention of Holderness in the one case, and that alone, could not have bound Phelps, nor can the intention of Miller in this case bind Johnston. Nor was the Phelps–Holderness case decided on any such doctrine. But the court in that case found that "Phelps was privy to the gambling contract—a *particeps criminis*"—and can recover no losses incurred in forwarding the transaction. Quoting from the record of the testimony, this court said, also, in that case: "Holderness testifies that it was never his intention to receive or deliver any cotton. The correspondence shows that Phelps was willing to buy or sell at his own risk an unlimited quantity of cotton for Holderness, without any inquiry as to his financial ability to meet the obligation he might enter into, provided only Holderness would put up the necessary 'marg ins.' That is a circumstance tending to show that he did not understand Holderness' offer to deal through him in 'futures' upon 'margins' as a *bona fide* proffer to buy cotton for actual delivery." His willingness to buy an unlimited amount was the real circumstance. In that case there was little or no direct evidence going to show what Phelps' understanding of the matter was, or what his intention was, and little as to the rules under which he managed 'futures' transactions for others, and, of course, any circumstance that would throw light on his intention would be admissible; but such a circumstance could possibly have little or no weight at all to contradict or overturn other direct evidence of the broker's methods of dealing, which at least show his intent. In the case at bar Johnston shows how he was dealing in this matter, and upon what principle; and it is impossible for us to conclude that the principle upon

which he dealt—the rules and regulations of the cotton exchange—if honestly adhered to, would lead to an infraction of the law. There is nothing in the evidence to show that he was doing anything else than adhering to these rules, and every presumption is in favor of the conclusion that he was acting in good faith; for otherwise he would not only lose the protection of the law, but his position as a member of the exchange. These are some, but not all, of the facts that differentiate this case from that of Phelps against Holderness.

The testimony of Johnston as to the rules and regulations of the New York Cotton Exchange, and his conduct of the business thereunder, is as follows, viz.:

"Interrogatory 9. If you state that you bought for R. J. Miller, of Van Buren, Ark., 500 bales of . cotton in October, 1895, for December delivery, please state whether or not this transaction was made on your part in strict conformity to the rules of the New York Cotton Exchange. A. The cotton bought for Miller on October 12, 1895, was in strict conformity with the rules of the New York Cotton Exchange. Interrogatory 10. Was it your purpose, in engaging in this transaction as the agent of R. J. Miller, to violate any rule of law, good morals, or public policy? A. As the agent of Miller in buying the cotton for him, it was not my purpose to violate any rule of law, good morals, or public policy. Interrogatory 11. In buying and selling this cotton for the said R. J. Miller, was it not your understanding that actual receipt of the cotton was contemplated by Miller in the month of December? A. In buying and selling the cotton for Miller, cannot say what his intention was as to receiving the cotton in the month of December, but it was my understanding, and the rules of the New York Cotton Exchange contemplate delivery of cotton on every contract by the seller, and the receiving of cotton by the buyer, and the seller of the cotton, under the rules of the exchange, would be compelled to deliver the cotton to me, as Miller's agent, if Miller instructed me to receive it, when I made demand for the cotton on the last day of the month. Interrogatory 12. Do you, in buying and selling cotton for future delivery, ever make any contract other than those which

are recognized by the rules and regulations of the New York Cotton Exchange? A. In buying and selling cotton for future delivery, I never make any contract other than those which are recognized by the rules and by-laws of the New York Cotton Exchange. Interrogatory 13. Do the rules and regulations of the New York Cotton Exchange recognize any contract except for selling and purchasing cotton to be actually delivered? A. They do not. Interrogatory 14. Was it or not your understanding, at the time you bought the 500 bales of cotton for the account of the said R. J. Miller for December delivery, that said cotton was by the said Miller to be actually received. A. I had no understanding with Miller as to whether he intended to receive the cotton. Interrogatory 15. Why did you sell on October 21st the cotton which you had bought for Miller? A. I sold the cotton which I had bought for Miller on October 21st under his instructions to do so by his telegram, night message, dated October 20, 1895, when his margin was exhausted. Interrogatory 16. Is it not true that the 19th day of October was on Saturday, and that, at the time the New York Cotton Exchange closed on Saturday, the margin of Mr. Miller was not exhausted, and is it not true that it was at your discretion as to whether or not, inasmuch as the margin was not exhausted, you would close out the cotton? A. At the closing of the market on Saturday, October 19th, Mr. Miller's margin was not exhausted, and I had no authority or right by law, or under the rules of the exchange, to close his contracts without notifying him in advance that I intended to do so at a certain time. Interrogatory 17. How many bales of cotton per day did you handle, on an average, during the cotton season of 1895? A. During the cotton season of 1895, I handled, on an average, about 13,000 bales of cotton per day. Interrogatory 18. Were not all of these purchases and sales of cotton made in conformity with the rules and regulations of the New York Cotton Exchange? A. They were. Interrogatory 19. Did you, or not, at the time you bought the cotton for R. J. Miller, understand that the said Miller would accept the cotton on the day it was to be delivered to him according to the terms of your purchase? A. Had no understanding with Miller as to

whether he would receive the cotton, but if he did not close the contracts out before the seller tendered delivery, I would have had to take the cotton for his account."

His answers on cross-examination were all to the same effect. There is nothing in conflict with this testimony as to the manner of dealing. It was sought to throw the burden of proof on the plaintiff to show affirmatively that his dealings were legitimate. We think plaintiff has done so, but the burden is not on him. *Bangs* v. *Hornick*, 30 Fed. Rep. 97.

Upon the facts as found by it, the court found that the contract was a gambling or wagering contract, and rendered judgment accordingly. In this there was error, in the opinion of a majority of us, and therefore the judgment is reversed, and the cause remanded.