ORVIS BROS. & CO. *v.* OLIVER.

4-5301                                   123 S. W. 2d 1065

Opinion delivered December 12, 1938.

*Dene H. Coleman,* for appellant.

*J. L. Taylor, DeWitt M. Hines* and *Bryan J. Mc-Callen,* for appellee.

SMITH, J. Appellants, who are brokers, have their principal office in the city of New York, with branch offices in a number of other cities. The transactions out of which this litigation arose were had with appellee through the Memphis branch. Appellants sued P. L. Oliver, of Corning, Arkansas, who operates a cotton gin and deals in cotton as P. L. Oliver & Company, to recover certain sums of money which they advanced for the account of Oliver in three futures transactions.

The transactions, which were evidenced by numerous telegrams, were as follows:

On March 8, 1937, Oliver, hereinafter referred to as appellee, placed with appellants a contract for July cotton at 13.35. This cotton was later sold, on instructions from appellee, at 13.96, which resulted in a profit to appellee, less commissions and taxes, of $272.91.

On April 2, 1937, appellee bought another contract for 100 bales of cotton at 14.25, and on April 19th sold the contract at 13.51, involving a loss, including commissions and taxes, of $397.04.

These transactions are admitted, and appellee concedes his liability for the difference between his profits on one transaction and the loss on the other if the contracts may be enforced. He says the contracts were gambling transactions and unenforceable for that reason in the courts of this state. There was a verdict and judgment in his favor, from which is this appeal.

There was a third transaction involving a similar purchase of cotton seed oil, which appellee testified was made without his authority, and the question whether this last-mentioned contract was unauthorized was not submitted to the jury as a separate issue of fact. The jury found that the admitted contracts were unenforceable, as being gambling contracts. It was, therefore, unnecessary for the jury to determine whether the oil contract had been made, as it would not have been enforced by the jury had it been admitted. It cannot, therefore, be said that the jury has found that the contract relating to the cotton seed oil was unauthorized. In view of what we shall hereinafter say, the validity of the cotton seed oil contract must be submitted to and be determined by the jury upon the remand of the cause for that purpose.

Testimony was offered by the brokers, hereinafter referred to as appellants, to the following effect. They are members of the New York Cotton Exchange, the New York Produce Exchange, and many other exchanges. They act as brokers for people who are not members of these exchanges, but do not buy anything for themselves. They solicit and receive business from ginners, cotton shippers, operators on the spot market who use cotton futures in their business, and from others. Appellee opened an account with appellants, and was extended a line of credit amounting to $1,000. No one can transact business in these exchanges who is not a member thereof.

The transactions in regard to the cotton above-mentioned were had and conducted in accordance with the rules and regulations of the Cotton Exchange, and when appellee was called upon to make good the net loss he had sustained he declined to do so, hence this suit.

Witness N. P. Boulet, the manager of appellants' Memphis branch, who conducted the transactions, testi-

fied that he was familiar with the rules and regulations of the Exchange, as well as with those of the United States Cotton Futures Act, and he knew that the contracts had been executed in accordance with the provisions of these rules and regulations and of that act. They could not otherwise have been executed in the Exchange. The writings offered as exhibits by the witnesses for appellants evidencing the transactions show that they were regularly executed. The testimony of Harry A. Levine is to the effect that he was a partner of appellants, in charge of the Commodities Department, and that appellants were members in good standing of the Exchange through which the transactions were had. He was personally familiar with the transactions, and knew that they were executed in accordance with the rules and regulations of the New York Cotton Exchange, and subject to the provisions of the United States Cotton Futures Act of August 11, 1916, and the transactions were actually executed on the floor of the New York Cotton Exchange.

Signed contracts, executed by appellants as agent for appellee, were offered in evidence, and these recite that the purchases of the cotton were "subject to the United States Cotton Futures Act." The correspondence between appellants and the parties with whom they dealt as agent for appellee makes certain the fact that the transactions were conducted in accordance with the rules of the New York Cotton Exchange, and all the writings evidencing the transactions stated, as above quoted, that they were subject to the United States Cotton Futures Act. The testimony is convincing and undisputed that the transactions were entered and cleared through the New York Cotton Exchange. A certificate issued under the seal of the Cotton Exchange details the transactions and leaves no doubt upon the subject.

It is insisted, however, that the purchase of the cotton and the sale thereof for the account of appellee was a gambling transaction, in that, appellee did not expect to receive and his vendor did not expect to deliver the cotton contracted for, and that this fact is conclusively evidenced by the sale of the contract before its July ma-

turity, at a profit in one instance and at a loss in the other, and that the transactions were a mere wager as to whether the price of cotton would go up or go down.

It may be true, as appellee contends, that he did not expect the actual delivery of the cotton which he purchased; but it is also true that he had a contract which entitled him to its delivery. He had the option to sell or "close out" his contract before the date on which delivery of the cotton was due, and he exercised that option. But the United States Cotton Futures Act, referred to in act 208 of the Acts of 1929 (Vol. II, Acts of 1929 of the General Assembly of the State of Arkansas, p. 1024), to which further reference will later be made, provides that he might demand actual delivery. This act appears in full in United States Statutes at Large, Vol. 39, Part I, beginning at page 476. This act is annotated in Vol. 6-A Federal Code, Annotated, pages 86 *et seq.,* and in United States Code, Annotated, Title 26, pages 584 *et seq.*

This act provides that actual delivery may be demanded, and that middling shall be deemed the grade of cotton contracted for if no other grade is specified. However, the writings evidencing the purchase of the cotton here in question specified that it was "for middling." This act provides that the grades which may be sold shall be within the grades for which standards are established by the Secretary of Agriculture. Certain inferior grades are declared not to be tenderable in satisfaction of the contract. Provision is made for variations in weight of the bales so that the total weight of a number of bales may aggregate the quantity or total weight contracted for. Delivery allowance is made for the difference above or below the contract price which the receiver of the cotton shall pay for cotton above or below the grade contracted for. There are other provisions which make certain that the appellee might have demanded delivery of the cotton, had he elected to do so, when his contract matured. The act provides that the relevant portions here involved "shall be deemed fully incorporated into any such contract if there be written or printed thereon, or on the document or memorandum evidencing the same,

at or prior to the time the same is entered into, the words, 'subject to the United States Cotton Futures Act, § 1094'." The writings evidencing the contracts here involved contained this indorsement.

It is no doubt true that in most cases arising under this act, as in the instant case, actual delivery was not intended, although no testimony was offered to that effect in the trial of this case, the contract required delivery, if demanded. In other words, the transaction is one generally called dealing on margins. But such contracts were held not to be gambling contracts in the case of *Johnston* v. *Miller*, 67 Ark. 172, 53 S. W. 1052, that opinion having been delivered November 18, 1899.

Subsequent to the rendition of that opinion the General Assembly of this state, at its 1907 session (act 162, Acts 1907, p. 388), passed "An act to prohibit contracts and agreements for the sale and future delivery of cotton, grain, provisions, and other commodities, stocks, bonds, and other securities upon margins, commonly known as dealing in futures; to declare such transaction unlawful and to constitute a misdemeanor on the part of any person, association of persons, or corporation participating therein, whether directly or indirectly; to prohibit the establishment, maintenance, or operation of any office or other place where such contracts are made or offered," and for other purposes. This act appears as §§ 2652 *et seq.*, C. & M. Digest.

It may be said, in passing, that, while this act was in full force and effect the case of *Mullinix* v. *Hubbard* arose in this state and was decided by the Circuit Court of Appeals of this circuit on May 27, 1925. 6 Fed. 2d 109. In that case the 6th headnote reads as follows: "That no deliveries were made under contract calling for future deliveries, but contracts were closed out by lawful and customary methods permitted by rules of New York Cotton Exchange and United States Cotton Futures Act (Comp. St., §§ 6309a-6309v), and that customer intended to close them out in such manner when he made contracts, did not make contracts illegal as wagering contracts."

The case of *Browne* v. *Thorn*, 260 U. S. 137, 43 S. Ct. 36, 67 L. Ed. 171, also arose in this state, and was decided

by the Supreme Court of the United States while the act of 1907 was in effect. Justice Holmes, speaking for the Supreme Court of the United States, in an opinion to which there was no dissent, said: "It is objected that the judge instructed the jury that hedging was lawful, hedging being explained as a means by which manufactures and others who have to make contracts of purchase or sale in advance secure themselves against the fluctuations of the market by counter contracts. *Prima facie* such contracts are lawful. *Chicago Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 25 S. Ct. 637, 49 L. Ed. 1031." The "hedging" contract there involved was enforced.

We prefer, however, to put our decision upon the provisions of act 208 of the Acts of 1929, hereinabove referred to, which act appears as §§ 3342, *et seq.,* Pope's Digest.

Section 10 of this act, appearing as § 3351, Pope's Digest, provides that "All laws and parts of laws regulating or prohibiting dealings in future contracts (or) in conflict or inconsistent herewith, be and the same are hereby repealed."

This act of 1929 appears to be an exact copy of chapter 97 of the session laws of Oklahoma for the year 1917, except a few unimportant verbal changes, and except also that our act contains a section, numbered 12, which declares that an emergency exists, which requires that the act shall take effect and be in force from and after its passage.

When our act was passed the Supreme Court of Oklahoma had delivered its opinion in the case of *Avery* v. *Goodrich* (October 7, 1924), 229 Pac. 577. This case must be given great weight, because the Oklahoma statute had been construed by the Supreme Court of that State in the case cited when we adopted the Oklahoma act, and the rule in regard to adopted statutes applies. It was there held by the Supreme Court of Oklahoma (to quote the headnote in that case) that "Where a petition states that a contract of sale for future delivery of cotton was made in accordance with the rules of any board of trade or exchange, where such contracts of sale are executed,

and was actually executed on the floor of such board of trade or exchange and performed or discharged according to the rules thereof and was placed by, with, or through a regular member, in good standing, of the cotton exchange or board of trade, organized under the laws of the state of Oklahoma or any other state, it alleges a valid and enforceable contract in the courts of this state, if such contract is further shown to conform with requirements of clauses 1 and 2 of the Session Laws of Oklahoma of 1917, c. 97, and that such contract was made subject to the provisions of the United States Cotton Futures Act, approved August 11, 1916 (U. S. Comp. St., §§ 6309a-6309v).''

In the case of *T. S. Faulk & Co.* v. *Fenner & Beane,* 221 Ala. 96, 127 So. 673, a headnote to a decision by the Supreme Court of Alabama reads as follows: ''Though proof that nothing was actually delivered at time of executing future marginal contract makes out a *prima facie* case of illegality of all forbidden transactions under Code 1923, § 6819, *prima facie* case, though made out under first part of the section, may be met and overcome by proof that contract was made under the United States Cotton Futures Act (26 USCA, §§ 731-752).''

Other decisions to the same effect by the same court are *Fenner & Beane* v. *Phillips,* 222 Ala. 106, 130 So. 892, and *Fenner & Beane* v. *Olive,* 226 Ala. 359, 147 So. 147.

The Supreme Court of Georgia, in the case of *Layton* v. *State,* 165 Ga. 265, 140 S. E. 847, construed a statute of that state making it unlawful to maintain a place of business in that state for the purpose of engaging in the business commonly called ''Dealing in futures on margins,'' and making a violation of the act a misdemeanor. A headnote in that case reads as follows: ''6. The act does not prohibit such transactions as are regulated by and fall within the terms of the act of Congress known by the short title of 'United States Cotton Futures Act', Fed. Stat. Ann. Supp. 1918, p. 359 (26 USCA, §§ 731 *et seq.;* U. S. Comp. St., §§ 6309a, *et seq.*).'' See, also, the opinion by the same court in the case of *Arthur* v. *State,* 146 Ga. 827, 92 S. E. 637.

Kentucky appears to have had a statute similar to our act of 1907, *supra,* but not to have had a statute similar to our act of 1929, *supra.* Notwithstanding that fact, it was held by the Court of Appeals of Kentucky, in the case of *Johnson* v. *Clark & Co.,* 224 Ky. 598, 6 S. W. 2d 1048, (to quote the headnote in that case) that "Where, on each order of principal to broker to purchase cotton for future delivery, broker mailed written confirmation which provided orders were received with understanding that actual delivery was contemplated, and that brokers had no agents; principal, for whom brokers closed deals at loss, could not avoid liability or recover margin advanced by showing person claimed to be broker's agent had notice that future delivery was not, in fact, contemplated, and that transactions were unlawful as gambling transactions, under Ky. St., § 1955, orders having been made in strict accordance with United States Cotton Futures Act (26 USCA, c. 13)." See, also, *Fenner* v. *Boykin,* 271 U. S. 240, 46 S. Ct. 492, 70 L. Ed. 927; *Thorn* v. *Browne,* 257 Fed. 519; *Getts* v. *Newburger,* 272 Fed. 209; *Jacobs* v. *Hyman,* 286 Fed. 346.

If it be said that any moral turpitude attached to gambling may not be removed by legislation, it may be answered that it is within the province of the General Assembly to declare what acts are and what acts are not gambling within the meaning of the laws of this state. That declaration has been made, so far as this case is concerned, by act 208 of the Acts of 1929, *supra.* Section 2 of this act reads as follows: "That all contracts of sale for future delivery of cotton, grain, stocks, or other commodities (1) made in accordance with the rules of any board of trade, exchange or similar institution where such contracts of sale are executed and (2) actually executed on the floor of such board of trade, exchange or similar institution and performed or discharged according to the rules thereof; and (3) when such contracts of sale are made with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution organized under the laws of the state of Arkansas or any other state shall be, and they are hereby declared to be valid and enforceable in

the courts of this state according to their terms, provided, that contracts of sale for future delivery of cotton in order to be valid and enforceable as provided herein must not only conform to the requirements of clauses (1), (2), and (3), of this section, but must also be made subject to the provisions of the United States Cotton Futures Act, approved August 11, 1916; provided, further, that if this clause should for any reason be held inoperative then contracts for the future delivery of cotton shall be valid and enforceable if they conform to the requirement of clauses one, two, and three of this section.''

Three conditions are imposed to make valid contracts for the future delivery of any commodity except cotton. As to cotton it is provided ''that contracts of sale for future delivery of cotton'' must be made ''subject to the provisions of the United States Cotton Futures Act, approved August 11, 1916,'' with the further proviso that if the last-mentioned clause ''shall be for any reason held inoperative, then contracts for the future delivery of cotton shall be valid and enforceable if they conform to the requirements of clauses one, two, and three of this section.'' This last-mentioned proviso has no application here, as the United States Cotton Futures Act remains in force.

The contracts here sued on conformed to the requirements of the section quoted, and we must hold that they are valid and enforceable, because the General Assembly has so enacted.

The judgment of the court below must, therefore, be reversed, and it is so ordered, and judgment will be rendered here for the plaintiff for $124.13, this being the difference between the profits on one transaction and the loss on the other, as stated above; and the cause will be remanded for the determination of the question whether the contract for the purchase of the cotton seed oil had been authorized, the verdict of the jury in the trial below not being decisive of that question.

HUMPHREYS and MEHAFFY, JJ., dissent.

SMITH, J. (on rehearing). In the petition for rehearing it is earnestly insisted that the cause should not have been remanded for a new trial upon the question of the authorization of the purchase of the cottonseed oil, for the reasons that appellant made no objection to the verdict of the jury on that account in the motion for a new trial, and that inasmuch as this issue was submitted to the jury under conflicting testimony, sufficient to support a finding either way—that is, that the contract was authorized or that it was unauthorized—the verdict of the jury is conclusive of that issue, and for the further reason that a reversal was not asked on account of the failure to render judgment in the cottonseed oil transaction in the briefs on the appeal to this court.

We do not agree with these contentions. It must be remembered that there were three separate transactions. Two of them were admitted; as to the third—the purchase of the cottonseed oil—it was denied that the purchase by the broker for the customer's account had been authorized. But it must also be remembered that no instruction was given asking the jury to specifically find whether the oil transaction had been authorized. It was contended that all these transactions were gambling transactions, and void for that reason. The jury found the fact so to be, and did not find for the plaintiff upon the admitted transactions. It was, under this finding, unimportant to determine whether the oil transaction was authorized or not, as no verdict would have been returned for the plaintiff had it been found that the oil transaction was authorized.

Appellant did not, in his motion for a new trial, assign as error the failure of the jury to find whether the oil transaction was authorized. But the law does not require any one to do a vain and useless thing. Why find whether the oil transaction was authorized or not, if a verdict would not be rendered on that account even though the finding was made that the transaction had been authorized.

Either party had the right to ask a specific finding on this question; but neither party made that request. Appellee was evidently content to have the case decided

318

upon the question whether the transactions, all three of them, were gambling transactions or not, and no other issue was submitted to the jury. Upon this state of the record we do not think it can be said that the jury made a finding that the oil transaction was unauthorized. That question was not specifically submitted to the jury, and it was unimportant, under the verdict of the jury, as to the gambling character of all the transactions, to determine whether one of them was unauthorized. No useful purpose would have been served by objecting to the form of the verdict, as appellee now insists should have been done. The verdict was in proper form, and was a proper verdict to render, under the instructions of the court, if the transactions were found to constitute gambling. If one was, all were.

Appellant did not waive this question in the brief on the appeal. Upon this issue it was said in the brief on the original submission of the case: "As to the additional debt occasioned by the purchase and sale of the 60,000 pounds of cottonseed oil, there is a dispute in the testimony, by reason of which the trial jury might have found a scintilla of evidence upon which to base a verdict for appellee in so far as that *lone transaction* was concerned, notwithstanding the facts that telegrams were sent direct to the appellee confirming each purchase and sale involved in this case, and that statements were mailed to him from time to time, personal demands made for payment of the entire account, and letters written from May, 1937, to January, 1938, requesting payment; and it was not until April 4, 1937, the trial day in court, that appellee ever denied any item of the account. However, we assume that it can serve no useful purpose at this time to discuss the merits of the cottonseed oil transaction."

The effect of this argument is to insist that the oil transaction was authorized by letters and telegrams, and were shown to have been authorized by various statements of the transaction mailed appellee from time to time, as well as personal demands, although there was conceded to be a scintilla of evidence to the contrary. But it was properly conceded that there was no use to

discuss the merits of the oil transaction, which was disputed, if there was no liability on the similar transactions which were admitted.

We do not think, therefore, that it can be said that the question of liability on the oil transaction was waived either in the court below or upon the appeal to this court, and the petition for rehearing is, therefore, overruled.