## LAYTON *v.* THE STATE.

1. The court did not err in overruling the demurrer to the indictment.
2. The act of 1906 (Civil Code of 1910, § 4257 et seq.), properly construed, does not apply to contracts for future delivery where there is an intent that the commodity bought or sold shall actually be delivered, but makes penal transactions on margins for future delivery where it is the intent to gamble on the fluctuations of the market; that is, where there is no intent to make actual delivery and "when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement."

Commerce, 12 C. J. p. 82, n. 97.
Criminal Law, 17 C. J. p. 203, n. 85.
Gaming, 27 C. J. p. 1001, n. 91, 94, 95; p. 1015, n. 66; p. 1017, n. 2; p. 1034, n. 57; p. 1039, n. 17; p. 1041, n. 64; p. 1088, n. 88, 89.

3 The theory upon which the conviction must be based is that there were no bona fide purchases or sales of commodities, but that persons in this State made through the defendant pretended purchases and sales on margin without any intention at the time to make or receive deliveries, and with intention to receive or pay the difference between the agreed price and the market price at the time of settlement, and that under the facts there were no bona fide purchases with intent to make actual delivery either in this State or elsewhere. In this view, the question does not arise as to whether the transactions were made wholly without the State of Georgia.

4 The proviso of section 2 of the act of 1906, "that nothing herein contained shall be construed to apply to transactions by mail or wire between a person in this State and a person outside this State, where the person outside this State is not represented in this State by any broker, agent, or attorney in said transaction," is not applicable to the present case. The proviso applies to transactions where a party, by himself or agent, writes or wires to another party, or his agent, in another State. This is not unlawful. In the present case it is contended that in this State, a person, acting through the firm of Fenner & Beane, wrote or wired to the head office or other office of that firm in another State. Such a transaction would be lawful or unlawful, depending upon whether there was in good faith at the time an intention to make or receive actual delivery or to "settle on the difference between the agreed price and the market price."

5. "In a strictly legal transaction the relation between a broker and his customer is ordinarily a special agency. Where a gambling transaction is treated as illegal, the broker who acts, knowing the intention of his customer to gamble, is often treated as principal, a particeps criminis, not as an agent. In such cases, principles of law ordinarily applicable to agency do not apply to such transactions." 27 C. J. 1088, § 333; *National Bank of Augusta* v. *Cunningham*, 75 *Ga.* 366. In order to support a conviction of a person acting as broker in such case, the proof must be sufficient to show that he acted with knowledge that his client did not at the time in good faith expect to make or receive delivery of the thing sold or purchased.

6. The act does not prohibit such transactions as are regulated by and fall within the terms of the act of Congress known by the short title of "United States cotton-futures act." Fed. Stat. Ann. Supp. 1918, p. 359.

7. Said act does not conflict with article 1, section 8, paragraph 3, of the constitution of the United States (Civil Code of 1910, § 6644), by which the States delegated exclusive power to the United States "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." *Alexander* v. *State*, 86 *Ga.* 246 (12 S. E. 408, 10 L. R. A. 859); *Arthur* v. *State*, 146 *Ga.* 827 (92 S. E. 637); *Fenner* v. *Boykin*, 3 F. (2d) 674; *Fenner* v. *Boykin*, 271 U. S. 240 (46 Sup. Ct. 492, 70 L. ed. 927); *Moore* v. *N. Y. Cotton Exchange*, 270 U. S. 593 (3) (46 Sup. Ct. 367, 70 L. ed. 750, 45 A. L. R. 1370).

8. Transactions between brokers on a cotton exchange, in the making of

contracts for future delivery, "which do not oblige interstate shipments, are not subjects of interstate commerce, nor does the fact that a delivery may be made by means of interstate carriage make them so." Ware v. Mobile County, 209 U. S. 405 (28 Sup. Ct. 526, 52 L. ed. 855); Hill v. Wallace, 259 U. S. 44 (42 Sup. Ct. 453); Board of Trade v. Olsen, 262 U. S. 1 (43 Sup. Ct. 470). The case quoted from "presented, only the question of the effect upon interstate trade or commerce of the taxing by a State of the business of a broker who was dealing in contracts for the future delivery of cotton, where there was no obligation to ship from one State to another." United States v. Patten, 226 U. S. 525, 543 (33 Sup. Ct. 141, 57 L. ed. 333).

9. Whether or not transactions by persons in one State with persons in another State in the purchase or sale of cotton for actual future delivery is interstate commerce will not be decided. Interstate shipments may or may not be obligatory. Ware v. Mobile County, supra, at pp. 412, 413. In this case, under our construction of the statute it makes penal only transactions in which no actual delivery is intended, and where the intention . . of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement.

10. The facts of the Ware case were differentiated by the Supreme Court from that class of cases where goods were sold "to be shipped from the one State to the other," thus amounting to interstate commerce; the court citing Robbins v. Shelby Co. Tax. Dist., 120 U. S. 489 (7 Sup. Ct. 592, 30 L. ed. 694); Rearick v. Pennsylvania, 203 U. S. 507 (27 Sup. Ct. 159, 51 L. ed. 295); Caldwell v. North Carolina, 187 U. S. 622 (23 Sup. Ct. 229, 47 L. ed. 336). In the Ware case, even where actual deliveries were contemplated, interstate shipments were not obligatory under the contract. "The seller was at liberty to acquire the cotton in the market where the delivery was required, or elsewhere."

11. The several sections of the 1906 act (Civil Code, §§ 4261, 4262, 4263) prescribing rules of evidence and creating presumptions from the existence of facts, are not in conflict with article 1, section 1, paragraph 3, of the constitution of Georgia (§ 6359), or with article 1, section 8, paragraph 3, of the constitution of the United States, supra. Griffin v. State, 142 Ga. 636 (83 S. E. 540, L. R. A. 1915C, 716, Ann. Cas. 1916C, 80); Arthur v. State, 146 Ga. 827 (supra); Kunsberg v. State, 147 Ga. 591 (2) (95 S. E. 12); Hawes v. State, 150 Ga. 101 (103 S. E. 170), s. c. 258 U. S. 1 (42 Sup. Ct. 204); Snead v. State, 165 Ga. 44 (139 S. E. 812); Fenner v. Boykin, supra; and see State v. Lapointe, 81 N. H. 227 (123 Atl. 692, 31 A. L. R. 1212, annotations 1222).

12. The ruling made in Forsyth Mfg. Co. v. Castlen, 112 Ga. 199 (37 S. E. 485, 81 Am. St. R. 28), to wit: "If, however, it is the intention of both parties to the contract that the goods shall not be actually delivered but that there shall be a settlement of the differences between them, according to the market price of the article, on a given day, such a contract would be a wager and not enforceable by either party," in so far as it rules that both parties must intend that there will be no delivery, is not applicable to this case. That was a civil case, based on a contract for future delivery between two individuals, to recover the sale

price of certain cotton delivered and damages for cotton refused. The case before us is one in which an individual was tried for a penal offense against the State, and under the terms of the statute the defendant would be guilty if he executed a transaction for a client with knowledge that the client did not intend a delivery of the goods bought or sold, but where it was the intention or understanding of the client to receive or pay the difference between the agreed price and the market price at the time of settlement. The use of the word "parties" in section 2 of the act (Civil Code, § 4258) is not to be construed as meaning that such intention must have been entertained by the parties on both sides of the contract. It is used in the sense of persons either buying or selling without intention to make actual delivery, without regard to the intention of the party or parties contracted with.

13. The court erred in refusing a request to give in charge to the jury the following: "An executory contract or agreement for the sale of cotton or other commodities to be delivered at a future date is valid and lawful under the laws of this State, although at the time of making the contract the seller has not the cotton or other commodity in his possession, has not contracted to purchase the cotton or other commodity, and has no expectation of acquiring the cotton or other commodity necessary to fulfill his contract otherwise than by purchasing it at some time before the day of delivery." *Forsyth Mfg. Co.* v. *Castlen,* supra; Board of Trade *v.* Christie &c. Co., 198 U. S. 236 (25 Sup. Ct. 637, 49 L. ed. 1031).

14. The court erred in refusing a request to give in charge the following: "When the law under which the defendant is indicted in the first count speaks of actual delivery, it does not necessarily mean personal delivery. A contract of the kind referred to in the law would be legal though neither of them contemplated making personal delivery to the other of the commodity called for in the contract, provided it was contemplated that actual delivery would take place though an agent or broker or by some one else who became substituted in the contract." 6 R. C. L. 780, § 185.

15. The ruling in *Forsyth Mfg. Co.* v. *Castlen,* supra, that "When a contract is valid upon its face, . . it is incumbent upon him who attacks the contract to show its invalidity," has no application to the present case. That ruling was made in that and other cases where no presumptions of law were supplied as in a criminal case under the act of 1906. The act of 1906 provides that certain stated facts when established constitute presumptions changing the burden of proof from the State to the accused.

16. The amendment to the motion for new trial contains 38 grounds, a number of which are repetitions for the purpose of stating the same principles in different ways. It is not deemed useful to deal in detail with each ground. From the rulings above made it will be readily seen that some of the grounds contain meritorious assignments of error, which require the grant of a new trial. All the grounds have received our consideration, but those not mentioned here are not meritorious or of sufficient importance or interest to require discussion.

17. As the case is remanded for a new trial on exceptions to the refusal of

the court to instruct the jury as requested, no ruling is made upon the sufficiency of the evidence to support the verdict.

No. 6000. NOVEMBER 16, 1927. REHEARING DENIED DECEMBER 17, 1927.

Keeping house for dealing in futures. Before Judge Humphries. Fulton superior court. April 16, 1927.

B. L. Layton and others were indicted on two counts for a misdemeanor. Count 1 charged that the accused "did establish, maintain, and operate an office and place of business for the purpose of carrying on and engaging in a business commonly called dealing in futures on margin, and did then and there, in said office and place of business established for the purpose aforesaid, maintain and operate and engage in a business commonly called dealing in futures on margin, contrary to the laws of said State," etc. Count 2 charged that the accused "did keep and maintain a gaminghouse, contrary to the laws of said State," etc. The defendant filed a demurrer to the indictment, on the ground that the two counts improperly joined two separate and distinct offenses. The court overruled the demurrer, and the defendant excepted pendente lite. After trial and conviction he moved for a new trial on the general grounds, amending later with 38 special grounds. The motion was overruled, and the defendant excepted, assigning error upon the two rulings just stated.

The first count of the indictment was brought under the act of August 20, 1906, prohibiting "dealing in futures," particularly sections 1 and 2 (Civil Code of 1910, §§ 4257, 4258). Section 4257 is: "It shall be unlawful for any person, association of persons, or corporation, either as principal or agent, to establish, maintain, or operate an office or other place of business in this State for the purpose of carrying on or engaging in the business commonly called dealing in futures on margins; and any person violating the provisions of this section shall be guilty of a misdemeanor." Section 4258 is: "Every contract or agreement, whether or not in writing, whereby any person or corporation shall agree to buy or sell and deliver, or sell with an agreement to deliver any wheat, cotton, corn, or other commodity, stock, bond, or other security, to any other person or corporation, when in fact it is not in good faith intended by the parties that an actual delivery of the articles or thing shall be made, is hereby declared to be unlawful, whether made or to be performed wholly within this State or partly within and partly without this State; it being the intent

of this section to prohibit any and all contracts or agreements for the purchase or sale and delivery of any commodity or other thing of value on margin, commonly called dealing in futures, when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement: Prov. led, that nothing herein contained shall be construed to apply to transactions by mail or wire between a person in this State and a person outside this State, where the person outside this State is not represented in this State by any broker, agent, or attorney in said transaction." Section 4259 makes violation of the preceding section a misdemeanor. Section 4260 refers to witnesses in such cases. The next three sections read as follows: "§ 4261. On any prosecution under the four preceding sections, proof that a defendant was a party to a contract, as agent or principal, to buy or sell and deliver any article, thing, or property, specified or named in said sections, or that he was the agent, directly or indirectly, of any party in making, furthering, or effectuating the same, or that he was the agent or officer of any corporation or association of persons in making, furthering, or effectuating the same, and that the article, thing, or property agreed to be sold and delivered was not actually delivered, and that settlement was made or agreed to be made upon a difference in value of the said article, thing, or property, shall constitute against such defendant prima facie evidence of guilt of the offense or offenses prohibited in said sections. § 4262. Proof that anything of value agreed to be sold and delivered was not actually delivered, and that one of the parties to such agreement deposited or secured, or agreed to deposit or secure, what are commonly known as 'margins,' shall constitute prima facie evidence of a contract declared unlawful by the terms of the preceding sections. § 4263. Proof that any person, association of persons, or corporation, either as principal or agent, has established an office or place where are posted or published from information received the fluctuating prices of cotton, grain, provisions, stocks, bonds, or other commodity or thing of value, or either of them, shall constitute prima facie evidence of guilt of the offense or offenses prohibited in section 4257."

The court gave in charge to the jury the three sections last above set out. Error is assigned thereupon in three grounds of the

motion for new trial. These allege §§ 4261 and 4262 to be violative of article 1, section 1, paragraph 3, of the constitution of Georgia (Civil Code of 1910, § 6359), providing that no person shall be deprived of life, liberty, or property, except by due process of law; and of the 14th amendment to the constitution of the United States, which provides that no State shall so deprive any person. Section 4263 is alleged to be violative of article 1, section 8, paragraph 3, of the constitution of the United States (§ 6644), declaring that Congress shall have power to regulate commerce among the several States. It is alleged that due process was violated, because "the presumption and prima facie case of guilt declared by and arising under said section of said act is arbitrary and wholly unreasonable, especially in that said presumption and prima facie case of guilt arise against the defendant irrespective of his good faith in the transaction, and arise from acts beyond his control, viz., where he is acting as agent and either his principal or his principal's principal or the opposite party to the contract breaches it and refuses to make delivery, or where his principal or his principal's principal and the opposite party make a settlement based upon differences in value of the article;" and arbitrary and unreasonable because "the element of failure of delivery is an act of third persons over whom the defendant has no control, and in that the element of depositing or agreeing to deposit margins is a requirement made for the purpose of guaranteeing performance of the contract and in no wise tends to indicate an intention not to perform." The ground with respect to § 4263 alleges that it was inapplicable to the case, because void in that the business operated by the firm of Fenner & Beane, for whom defendant was shown to be an agent, consisted in collecting and recording information with regard to prices on cotton and other commodities coming over telegraph wires to the office of said firm from exchanges in New York and New Orleans, outside the State of Georgia, all of which was a part of interstate commerce, over which the lawmaking power enacting said law had no control or authority.

Another ground of the motion assigns error upon the refusal of the court to charge the jury that under the U. S. cotton-futures act and the amendment thereof of March 4, 1919, Congress has undertaken "the regulation of every contract of sale of any cot-

ton for future delivery made at or in any exchange, board of trade, or similar institution, and of the methods of delivery thereunder; that if you find from the evidence that all contracts for future delivery of cotton made by Fenner & Beane for their customers whose orders were transmitted from their Atlanta office were made at, on, or in any exchanges and were made in compliance with the 5th section of the act of Congress just referred to, the defendant could not be convicted for any participation in the solicitation of, the furtherance of, or the making of such contracts or for maintaining an office for the carrying on the business of dealing in such contracts; that under article 1, section 8, of the constitution of the United States, upon the passage of said act of Congress, the statute of the State of Georgia under which the defendant stands indicted in the first count of the indictment became null and void in so far as it relates to contracts for the sale of cotton for future delivery made at, on, or in any exchange in pursuance of section 5 of said act of Congress, because said act of Congress, being a regulation of commerce in cotton among the several States, is, under the clause of the constitution just referred to, exclusive, and the effect of its passage by Congress was to render said statute of this State unconstitutional, null and void so far as it relates to the same subject." Another ground assigns error upon the court's charge that if the jury considered that the defendant was guilty under count 1, under the evidence and instructions as to the law, the same state of facts under the law would justify a conviction under count 2.

The voluminous evidence in the case varies, there being direct testimony offered by each side to establish its contention. The State introduced a number of witnesses who testified that they had placed orders with Fenner & Beane for contracts for the future delivery of cotton while the defendant was manager. Several of these witnesses testified that they placed orders for stated numbers of bales of cotton from time to time, but that they never expected any actual delivery to them nor did they ever expect to make any actual delivery to the Fenner & Beane firm, nor were any deliveries of any kind ever made by either party to the contract for buying or selling. One witness, for the State, on cross-examination, testifying as to the method of dealing with the firm, said: "I never made any trade of any kind whatever in the

Atlanta office, but I always telegraphed my orders to New Orleans or New York. I traded through both the New York office and the New Orleans office. In every case the trade was initiated by my writing out an order and asking their operator to send to Fenner & Beane either at New York or at New Orleans. I expected them to act as my broker or agent, to go on the exchange at New York or New Orleans. and buy that· contract, wherever I ordered them to buy. And where I ordered to sell, `I ordered them to go into the market and sell it for me. I expected them to bind me to deliver that cotton when the time came, unless I had sold out my contract to somebody else. If I say I bought a hundred bales of cotton, what I got was a contract with somebody else to deliver me that hundred bales of cotton; that is, somebody Fenner & Beane had traded with for me in New Orleans or New York. Having that contract for that amount of cotton, the way I closed it out was by ordering them to sell that amount of cotton that I had coming to me to some third person. I settled out the contract by the payment of the difference between what I made my first contract for and what I sold my second contract for to some third person, exactly like I had taken a bond for title to a piece of property and had given a separate bond for title to somebody else at a profit. . . I have been to Fenner & Beane's office a great deal in the last four years. I didn't know what they were doing. I have seen persons in there giving orders. All the orders given there are telegraphed outside the State. You can't make a trade to buy or sell from or to Fenner & Beane, themselves. They telegraph it themselves. When telegraphed to Fenner & Beane, the order isn't buying and selling from them or to them, but ordering them to buy or sell for you." On direct examination the same witness testified: "Dealing in futures on margins is generally conducted like I have stated." The sum and substance of the testimony of the State's witnesses was that "orders" or "contracts" were placed with Fenner & Beane at their office in the Healey Building in Atlanta; that such orders, to buy or to sell, were wired to New York or New Orleans; that where the price of cotton declined and the office outside the State "called" for margins, such margins were paid at the Atlanta office; that "the transactions were closed out or finished in the Healey Building;" that there were never any actual deliveries of cotton, nor

were any ever contemplated; that the Atlanta office "transmitted" to New York or New Orleans the "contracts" or instructions to make contracts, the understanding being that the New York or New Orleans branch of Fenner & Beane was to be the broker of the Atlanta client; that the buying or selling was not from or to Fenner & Beane. There was testimony from some of the State's witnesses, on cross-examination, that deliveries were contemplated "under these contracts when finally cleared out;" that "the man I had paid to make delivery would make delivery by getting somebody to take my place."

The defense offered a considerable array of witnesses. C. E. Fenner testified that the Atlanta office was maintained "for the purpose of receiving and transmitting on the wires business of the exchanges of which we are members. . . There is no other business carried on in this office here in Atlanta. Mr. Layton has no authority from me or from the members of my firm to make any contract with any person in the Atlanta office. Customers in Atlanta come to our office; they decide when they want to buy cotton or sell cotton, buy stocks, sell stocks or bonds, as the case may be; then they write an order which is handed to Mr. Layton as the manager of the office. That order is transmitted to us by wire in New Orleans; that order is received in the New Orleans office—an order to buy or sell cotton. If the order is an acceptable order, we proceed to carry out the instructions of that order." This witness testified that all such orders were executed by a representative of the firm going on the floor of the exchange and offering to buy or sell the stated number of bales of cotton, according as the order received over the wire was to buy or sell. The defense introduced a number of witnesses whose testimony, with the statement of the defendant, tended to establish the contentions, "that every transaction relating to the purchase or sale or agreement to purchase or sell and deliver any article or thing with which the Atlanta branch of Fenner & Beane was connected was a transaction by wire or mail between persons in this State (the customers of Fenner & Beane in this State) and persons outside this State (the persons with whom Fenner & Beane, acting as brokers for their customers in this State, made contracts for purchase or sale for future delivery over the exchanges in New York, New Orleans, or Chicago), where said persons outside this State

were not represented in this State by any broker, agent, or attorney in said transaction; that in no transaction of purchase or sale involving the Atlanta office was there ever made a settlement by the payment of the difference between the agreed price and the market price at time of settlement, the only money paid or received, except Fenner & Beane's commissions as broker, being the difference the broker was, able to realize by making for the customer dealt with a contract to buy or sell at a given price and by subsequently making for said customer with some other person another contract to receive (or, in case of sale, to deliver) at another price the thing involved in said first contract; that in every transaction eventuating in an agreement to buy or sell for future delivery the delivery was in fact made, though the original party to the contract did not make the delivery but so contracted as to cause the same to be made through the clearance system on the exchange under the rules of which the agreement was made; and that if any person dealing through the Atlanta office did not have a bona fide intention of actual delivery, but had the intention or understanding that he was to receive or pay the difference between the agreed price and the market price at time of settlement, such intention was not known to the defendant, nor did he participate therein. Nowhere in the evidence is it disclosed that actual deliveries of cotton or other commodities were ever made by or to clients of Fenner & Beane in this State. Nor does the documentary evidence, giving the names of brokers outside this State with whom Fenner & Beane dealt for their Atlanta clients, furnish the name of any person from whom said clients in this State were to receive actual deliveries of cotton or other commodities through any broker or otherwise, or to whom said clients were to make actual deliveries through brokers or otherwise.

*Little, Powell, Smith & Goldstein,* for plaintiff in error.

*John A. Boykin, solicitor-general, J. W. LeCraw, Hooper Alexander,* and *J. W. Austin,* contra.

GILBERT, J. 1. The first headnote does not require elaboration.

2. One ground of the motion for new trial was based upon the refusal of the court to instruct the jury, as duly requested, viz.: "Dealings in all kinds of contracts for the future delivery of commodities are not forbidden by the act under which the defendant

is indicted in the first count of the indictment. The only kinds of contracts which are forbidden by the act are contracts or agreements whereby some person or corporation agrees to buy or sell and deliver or sell with an agreement to deliver on margin wheat, cotton, or other commodity, stocks, bonds, or other securities, to any other person or corporation, when in fact it is not in good faith intended by the parties that an actual delivery of the article or thing shall be made, and when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement." This ground does not require a reversal. The brief of plaintiff in error concedes, in fact, that the matter requested was "in accordance with the court's general charge." We construe this as an admission that the request was covered by the general charge. The act of 1906 (Civil Code, § 4257 et seq.), properly construed, does not apply to contracts for future delivery where there is an intent that the commodity bought or sold shall actually be delivered, but makes penal transactions on margins for future delivery where it is the intent to gamble on the fluctuations of the market; that is, where there is no intent to make actual delivery, and "when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement." Transactions in commodities and securities, whether called speculation, gambling, or simply contracts for future delivery, have been the subject of legislative and judicial interpretation for many years. Some 200 years ago these dealings had become so demoralizing in England that Parliament passed an act to prevent the "practice of stock jobbing." It was directed against apparent sales which, in fact, were not intended to be real and where no deliveries were intended to be actually made. 6 R. C. L. 782, § 187. Georgia is only one among a number of States which have undertaken to prohibit gambling in stocks and commodities. The Georgia act of 1906, prohibiting "dealing in futures," does not prohibit real contracts, entered into in good faith, with the intention at the time that an actual delivery shall be made. It is intended to prohibit and punish gambling or speculation upon chance, where no real delivery is contemplated and where the parties expect or intend at the time to settle on the basis of the difference between the agreed price at the time of con-

tracting and the market price at the time of their settlement. "If under the guise of a contract for future delivery the real purpose is merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, the whole transaction constitutes nothing more than a wager. It makes no difference that a bet or wager is made to assume. the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade. The mere fact that there was specific property about which the transaction occurred would make no difference. Parties may as effectually gamble with reference to actual property as with reference to the prices of different classes of property." 6 R. C. L. 781, § 186, and cit.

This court has dealt with several phases of the subject, before and since passage of the 1906 act. *Alexander* v. *State,* 86 *Ga.* 246 (supra); *Forsyth Mfg Co.* v. *Castlen,* 112 *Ga.* 199 (supra); *Kilpatrick* v. *Richter,* 139 *Ga.* 643 (77 S. E. 1065); *Robson* v. *Weil,* 142 *Ga.* 429 (83 S. E. 207); *Arthur* v. *State,* 146 *Ga.* 827 (supra). These cases cite others bearing on the question. *Anderson* v. *State,* 2 *Ga. App.* 1 (58 S. E. 401). The Federal court first dealt with the matter out of which the present case arose, when the firm of Fenner & Beane filed suit therein to enjoin the solicitor-general and the sheriff of Fulton County from proceeding in Fulton superior court with a criminal prosecution which finally resulted, after the injunction was refused, in the conviction of Layton, Atlanta manager for Fenner & Beane. The opinion of Judge Sibley of the United States Northern District of Georgia is so clear and applicable that we quote from it as follows: "The statute is, we think, to be construed as condemning only gaming transactions, and not all sales for future delivery where a margin is deposited in lieu of full payment or full credit given. The earlier Georgia decisions did not clearly mark the distinction between contracts for future delivery where there was an intent that the goods bought should really be delivered and those in which neither party had such intent, but assumed all contracts for future delivery made on margins to be gaming. . . In 1900 the question received elaborate consideration in *Forsyth Mfg. Co.* v. *Castlen* [supra]; and in line with the general rule elsewhere, con-

·tracts for future delivery were held valid though the seller had not the property sold, if either party contemplated an actual delivery, but to be gaming and contrary to public policy if neither party so intended but both expected to settle by the fluctuation in market price of the goods contracted for. The statute here in question was passed a few years later. Its title indicates a purpose to prohibit what was 'commonly known as dealing in futures,' and the establishment or operation of a place where 'such contracts' are made or offered. . . Section 2 contains the elaboration and describes 'what is commonly called dealing in futures' as being a contract or agreement for the sale of commodities, whether made or to be performed wholly within the State or partly within and partly without the State 'when in fact it is not in good faith intended by the parties that an actual delivery of the articles or thing' was to be made, and 'when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement.' The act, therefore, is but a legislative sanction of the law as stated in the *Castlen* case and imposes penalties as for a crime upon what was already unlawful. The sections raising presumptions show that the intent of the parties is to be a part of the crime, for otherwise the presumptions would be useless. . . Transactions such as are here condemned are not commerce at all, and if carried on across State lines are not sanctified thereby. They are not interstate commerce, but interstate gambling. *Alexander* v. *State* [supra]." Fenner *v.* Boykin, 3 Fed. (2d) 674. This decision was affirmed by the United States Supreme Court. Fenner *v.* Boykin, 271 U. S. 240 (supra).

In' the *Arthur* case, supra, the accused was indicted under the 1906 act, and the evidence was very similar to the evidence here. The rulings there made are in harmony with the rulings now made in this case. Cases in other jurisdictions are so numerous that we select for citation, as a fair example, Winward *v.* Lincoln, 23 R. I. 476 (51 Atl. 106, 64 L. R. A. 160), which is elaborately annotated. It deals with sales of "stocks" for future delivery. The present case is one of sales of cotton for future delivery, but the principle is the same. In the Winward case the court said: "The rapid fluctuations in the market price of stocks, and the ease with which transfers and hypothecations of stocks may be made, render

them a favorite subject for speculation, either legitimate or otherwise; and where there is suspicion that a given transaction in stocks is only cover for a wager, a court will very carefully scrutinize the circumstances of the case, and disregard the form, if the illegal substance appears. But the indicia of a wager upon the rise and fall in the price of stocks are no different from those of wagers upon any uncertain future event. And so lawful trading in stocks has the same characteristics as lawful trading in any commodity. Mitchell, J., in Hopkins v. O'Kane, 169 Pa. 478 (32 Atl. 421), says: 'It ought not to be necessary to say again, after Peters v. Grim, 149 Pa. 163 (24 Atl. 192, 34 A. S. R. 599), and other cases, that a purchase of stocks on margin is not necessarily a gambling transaction. Stocks may be bought on credit, just as flour or sugar, or anything else; and the credit may be for the whole price or for a part of it, and with security or without it. "Margin" is security, nothing more; and the only difference between stocks and other commodities is that, as stocks are more commonly made the vehicle of gambling speculation than some other things, courts are disposed to look more closely into stock transactions, to ascertain their true character. If they are real purchases and sales, they are not gambling, though they are done partly or wholly on credit.' . . Morris v. W. U. Tel. Co., 94 Me. 423 (47 Atl. 926), is a case where the contract was expressed in scrupulously legal form; but it was admitted 'that "in such a transaction or deal the method of business in the plaintiff's deal is as follows: Such trades are made on quotations only, no actual stock being in fact sold; but settlements of differences are fully made when the deals are closed as to profits and losses." This admission,' says the court, 'is fatal to the plaintiff's case. It strips the transaction of the semblance of legitimate business, with which the memorandum endeavored to clothe it, and leaves it a naked bet or wager upon the rise and fall of the price of the stock, which the law terms a gambling contract, and pronounces immoral and void.'" Based on what is said above, we construe the act of 1906 to authorize a penal conviction thereunder whenever the evidence warrants a finding that the accused has done the things prohibited in the act and when at the time it is not in fact intended, in good faith, by such accused "that an actual delivery of the articles or thing" should be made, but where the intention

is "to receive or pay the difference between the agreed price and the market price at the time of settlement." This finding may be authorized, whatever the form of the transaction or however scrupulously the form of the contract may follow the mandates of the law, if in the guise of a legal transaction it is in fact at the time the intention of the parties to gamble on the fluctuation of prices and to settle the differences as aforesaid and without actual delivery.

3. It is earnestly insisted by counsel for plaintiff in error that under the facts of this case there were no purchases or sales within this State; that the agent of Fenner & Beane in Atlanta merely represented Georgia clients and communicated their wishes to the New Orleans or other office outside this State, and that such office thereupon executed the same on the floor of the cotton exchange with a broker representing another party. If the jury had accepted this view, the contention just stated would undoubtedly raise another question; but, as we have said elsewhere, we think the act does not denounce real sales, such as the defendant claims. If, as contended by the prosecution, there were no bona fide contracts calling for actual deliveries, but only transactions where no actual deliveries were intended, then we have no occasion to deal with the question sought to be raised. The testimony by the State shows a large number of transactions. All of these are substantially alike. Clients or customers of Fenner & Beane initiated the transaction through the defendant in Atlanta, and in no case was there any actual delivery of cotton to any of these persons. Section 6 of the 1906 act (Civil Code, § 4262) declares that proof that the commodity "was not actually delivered, and that one of the parties to such agreement deposited or secured, or agreed to deposit or secure, what are commonly known as 'margins,'" shall constitute prima facie evidence of a contract declared unlawful by the act. It appears that in the transactions the customers deposited margins or were allowed credit, and that Fenner & Beane, in the Atlanta office, maintained a board on which was posted information of fluctuating prices of cotton and other commodities. This is made by the act prima facie evidence of guilt. The presumptions, of course, were rebuttable. It therefore became a question whether the presumptions were rebutted. Where substantially all of the transactions

in the Atlanta office with the witnesses introduced by the State were not followed by any actual deliveries to or by these clients, it became a jury question whether the presumptions were rebutted. We do not overlook the fact that these clients were not required to make personal deliveries. They could make deliveries by assigning or transferring their contracts and imposing the duty upon others to make them in their stead. Nor do we overlook the documentary evidence tending to show that Fenner & Beane, as brokers for Georgia clients, went through the form of making contracts with other named brokers for unnamed principals. Notwithstanding this evidence, it was a question for the jury to find what was the truth.

4-13. None of the remaining headnotes require elaboration.

*Judgment reversed. Hill, J., concurs. Russell, C. J., and Hines, J., dissent from the judgment. Beck, P. J., and Atkinson, J., dissent from the ruling in the eighth headnote.*

### ON MOTION FOR REHEARING.

Counsel for defendant in error filed a motion for rehearing. Their argument is grouped as follows: "1st. That the court had overlooked several material facts in the record. 2nd. That the court had overlooked a statute. 3rd. That the court had overlooked several decisions both in the State and Federal courts which are controlling as authority and which would require a different judgment from that rendered." The motion has served a useful purpose in pointing out what we consider was unsatisfactory language in some of the headnotes. Accordingly, those headnotes have been redrafted and modified. Cases counsel contend were overlooked are referred to as far as deemed pertinent. It is not deemed necessary or profitable to refer to Federal statutes further than has already been done. The motion insists that the court "has apparently overlooked the fact that Code section 4258 has nothing to do with the case—that defendant was indicted under section 4257, and that the only elements necessary for conviction thereunder are: 1st, the opening of an office, and 2nd, the purpose to carry on there the business of dealing in futures on margins." The court did not overlook that contention. We could not accept that view of the law, and the majority of the court agreed to a contrary construction. The entire decision turned upon that as the basic principle. The caption of the 1906

act, so far as is material in the present discussion, is as follows: "An act to prohibit contracts and agreements for the sale and future delivery of cotton, grain, provisions, and other commodities, stocks, bonds and other securities upon margin, commonly known as dealing in futures; to declare such transactions unlawful, and to constitute a misdemeanor on the part of any person, association of persons, or corporation participating therein, whether directly or indirectly; to prohibit the establishment, maintenance, or operation of any office or other place where such contracts are made or offered," etc. The first section of the act (Code § 4257) penalizes what is "commonly called dealing in futures on margins." The second section of the act (Code § 4258) defines what is meant by the phrase, "commonly called dealing in futures." Without reference to the second section, it can not be judicially determined what is meant in the first, and reference to the caption of the act aids the court and confirms the view shown by section 4258. If the view of movants is correct, any person may be convicted by showing (1) opening an office, and (2) having the purpose to carry on the business of dealing in futures on margin. This view we rejected. Such dealing may be entirely lawful, where actual deliveries are made or are intended to be made. In such cases manifestly the legislature did not intend to make it unlawful and penal to open an office for carrying on such business. We endeavored to make this clear in the opinion.

The very facts the motion refers to as having been overlooked were elaborately mentioned in the statement of facts, it being made clear in that statement that no deliveries had been shown with regard to customers dealing through the Atlanta office. The statement concluded as follows: "Nowhere in the evidence is it disclosed that actual deliveries of cotton or other commodities were ever made by or to clients of Fenner & Beane in this State. Nor does the documentary evidence, giving the names of brokers outside this State with whom Fenner & Beane dealt for their Atlanta clients, furnish the name of any person from whom said clients in this State were to receive actual deliveries of cotton or other commodities through any broker or otherwise, or to whom said clients were to make actual deliveries through brokers or otherwise." Besides, it is pertinent to recall that the last headnote rules as follows: "As the case is remanded for a new trial

on the exceptions to the refusal of the court to instruct the jury as requested, no ruling is made upon the sufficiency of the evidence to support the verdict." After careful consideration of the motion, which its importance deserved, we find no sufficient reason for reopening the case.