26367. FENNER & BEANE *v.* CALHOUN.

DECIDED DECEMBER 4, 1937.

*Johnston & Jones, Jones, Russell & Sparks, R. D. Smith,* for plaintiffs.

*Steve F. Mitchell,* for defendant.

BROYLES, C. J. Fenner & Beane, cotton brokers, sued B. R. Calhoun on an open account for the principal sum of $444.94, besides interest at the rate of seven per cent. per annum from March 11, 1935. A sworn itemized statement of the account was attached to the petition. The defendant pleaded that the suit was based on a "cotton-future" contract entered into by him and the plaintiff, upon margins, and that there was no bona fide intention of either of the parties that such cotton should actually be delivered, but the intention was that, at the time of settlement of such contract, settlement was to be made according to the market price of the

cotton in question; and that such contract was a gaming contract, unlawful under the laws of Georgia, and that the plaintiff is not entitled to recover the amount sued for. Defendant further pleaded "that on two previous occasions, to wit: July 19, 1934, and September 20, 1934, contracts of this defendant, the former contract of 100 bales, having been bought at 13.22 ¢ per pound, was sold August 8, 1934, for 13.75 ¢, leaving this defendant a credit of $232.93; and, on the latter occasion above-mentioned, the contract was bought for 10.28 ¢ and sold for 10.07 ¢, a net loss for this defendant of $137.55, and there never was any delivery of cotton actually made or intended to be made." After the introduction of evidence by both parties the court, on motion of the plaintiff, directed a verdict in favor of the plaintiff for the sum of $381.58 as principal, and $46.70 as interest. Subsequently, the defendant's motion for new trial was granted, and the plaintiff excepted. There is no issue as to the amount of the directed verdict, the sole question (except as to the admissibility of certain evidence introduced by the plaintiff) being: was a verdict for the plaintiff demanded by the evidence?

This case involves a marginal contract for the future delivery of cotton. Under the act of 1929 (now embodied in the Code, §§ 20-602, 20-603), such a contract is valid and enforceable, if made in accordance with the rules of any board of trade, exchange, or similar institution, and actually executed on the floor of such institution according to its rules, and where the contract is placed with or through a regular member in good standing of a cotton exchange, or similar institution organized under the laws of this State or any other State; provided, that a contract of sale for future delivery of cotton must also be made subject to the provisions of the United States cotton-futures act approved August 11, 1916, and any amendments thereto. Under the act, such a contract becomes unlawful only where the parties thereto do not contemplate an actual delivery of the cotton sold or bought, but intend to settle upon the basis of the public market quotations made on any exchange, without having any actual bona fide delivery, and without the carrying out of such contract on the floor of such exchange. Before the passage of the act of 1929, the statute (act of 1906) merely declared that any contract for the purchase or sale of any commodity on margin, when in fact it was

not in good faith intended that an actual delivery be made, was unlawful. As before stated, the statute now in force was passed in 1929, and we have been unable to find any decision of the Supreme Court or of this court construing it. However, the statute in force before that act has been interpreted by both of our appellate courts, and the two statutes are sufficiently similar to make the hereinafter-stated interpretations of the prior statute applicable to the construction of the latter one. Both of our appellate courts have held, that, under the provisions of the act of 1906, the party pleading the invalidity of the contract has the burden of proving its invalidity, and must show that it was the intention of *both* parties to the contract that the goods were *not* to be actually delivered. *Forsylh Mfg. Co.* v. *Castlen,* 112 *Ga.* 199 (2) (37 S. E. 485, 81 Am. St. R. 28); *Robson* v. *Weil,* 142 *Ga.* 429 (2); *Anderson* v. *Cavanaugh,* 16 *Ga. App.* 446 (7) (85 S. E. 606). The foregoing rulings as to the burden of proof being cast upon the party pleading the invalidity of the contract, and that he must show that it was the intention of *both* parties *not* to have any actual delivery of the goods, are applicable to the act of 1929, and are controlling in the instant case. There are also decisions to the same effect from other States, and from the Federal courts, construing substantially similar statutes and contracts. "A transaction which on its face is legitimate can not be held void as a wagering contract by showing that *one party only* so understood and meant it to be. The proof must go further, and show that this understanding was *mutual* and that *both* parties so understood the transaction." Bibb *v.* Allen, 149 U. S. 481, 492 (13 Sup. Ct. 950, 37 L. ed. 819); Irwin *v.* Williar, 110 U. S. 499 (4 Sup. Ct. 160, 28 L. ed. 225); Gettys *v.* Newberger, 272 Fed. 209 (7, 8); Jacobs *v.* Hyman, 286 Fed. 346 (2).

The case of James *v.* Clement, 223 Fed. 385, cited by counsel for Calhoun, while a Georgia case, was decided *before* the passage of the act of 1929. Furthermore, the customer in that case testified that he did not intend to accept delivery of the cotton, *and so told the broker.* The broker denied that he had been so told. That conflict in the evidence raised an issue of fact, and the question was properly submitted to the jury. In the instant case there was no such conflict in the evidence and no issue of fact for the jury to determine. Also, in that case, the evidence showed that

the cotton was not sold for the customer's account *by an actual sale to a third person on the floor of an organized exchange.* The case of *Arthur* v. *State,* 146 *Ga.* 827 (92 S. E. 637), cited by Calhoun's counsel, was a criminal action against a broker for a violation of section 403 of the Penal Code (1910), which made it unlawful, under the act of 1906, for any one to engage in the business commonly called "dealing in futures on margins." Under the act of 1929 such dealing is not unlawful. In Fenner & Beane *v.* Holt, 2 Fed. (2d) 253, also cited by counsel for Calhoun, the customer testified, in effect, that he had no intention of accepting a delivery of the cotton, and that *the broker knew of that intention.* In addition, there was other evidence of an understanding by *both* parties that the contract was to be settled before the delivery date *on the difference in the market price;* and moreover, the case originated in Georgia and was decided *before* the passage of the act of 1929. In the instant case the undisputed evidence showed the following facts: On November 24, 1934, Calhoun had a pending contract with Fenner & Beane for the purchase of 100 bales of cotton for December delivery. On the same day Calhoun orally notified the Macon, Georgia, office of Fenner & Beane to sell the cotton and buy for him 200 bales of cotton for July delivery. Nothing was said at the time by either of the parties as to whether actual delivery of the cotton was contemplated. On the same date Fenner & Beane, through its New York agent, a member in good standing of the New York Cotton Exchange, sold the 100 bales which Calhoun had bought for December delivery, and purchased 200 bales for July delivery from Anderson, Clayton & Fleming, the cotton being bought on the floor of the New York Cotton Exchange, and subject to the by-laws, rules, and conditions of said exchange, and to the United States cotton-futures act. On the same day Fenner & Beane, through its New Orleans office, mailed a statement of said purchase to Calhoun at Macon, Georgia, which was received and kept by him. The statement informed Calhoun of the purchase of the 200 bales of cotton for July delivery, subject to the rules, etc., as above stated. The statement also contained the following provision: "All orders for the purchase and sale of cotton are received and executed with the distinct understanding that actual delivery is contemplated in accordance with the requirements of the United States cotton-futures act (§ 5), and that the

party giving the order so understands and agrees." Calhoun was also notified in the statement that on all marginal trades Fenner & Beane reserved the right to sell, without notice, contracts when the margins were exhausted. Calhoun did not protest any of the provisions in the statement received by him, and was silent as to any contrary intention on his part. On March 11, 1935, before the delivery date, Calhoun's margin was exhausted, and Fenner & Beane sold the cotton at a loss to Calhoun of $444.94, the sale being made by the New York agent of Fenner & Beane on the floor of the New York Cotton Exchange and subject to the by-laws, rules, and conditions of said exchange and of the United States cotton-futures act. The rule of the New York Cotton Exchange which governed the purchase and sale of this cotton is as follows: "Rule 8. All contracts for the future delivery of cotton shall be binding upon members, and of full force and effect until the qualities and quantity of cotton specified in said contracts shall have been delivered, and the price specified in such contracts shall have been paid. *No contract* shall be entered into with any *stipulation* or *understanding between the parties, at the time of making such contract, that the terms of such contract* as specified in § 33 of the by-laws *are not to be fulfilled, or that the cotton is not to be delivered and received in accordance with said section."* (Italics ours.) Calhoun failed to pay Fenner & Beane for the loss on the cotton transaction, and this suit was brought.

It is true that Calhoun testified that *he* had no intention of having an actual delivery of the cotton made to him; *but there is no evidence in the transcript of the record authorizing a finding that Fenner & Beane did not intend to make such delivery, or that Fenner & Beane knew that Calhoun did not contemplate an actual delivery of the cotton;* and the burden was on Calhoun to show that no delivery was contemplated by *both* parties, since the undisputed evidence shows that Fenner & Beane had complied with all of the provisions of the act of 1929; and such compliance raises a prima facie presumption of an intent to deliver. The fact that Greene (Fenner & Beane's agent), when asked whether any contract was ever had with Calhoun where he told Calhoun that *no* delivery was contemplated, testified that "that subject was never discussed" is insufficient to overcome the prima facie presumption of an intent to deliver, since nothing was said by the parties about *not* deliver-

ing the cotton. Calhoun contends that the prior dealings between the parties, as shown by two contracts introduced, established a custom between them, and showed that actual delivery was not intended. One contract was dated November 21, 1933; the other, August 8, 1934. These "contracts," however, are merely sales slips, showing that certain numbers of bales of cotton were bought by Calhoun on certain dates at certain prices, and sold on certain other dates at certain prices. The fact that these documents show that the cotton was sold *before* the delivery date thereof does not establish that the actual delivery of the cotton was not intended by the parties, since there is nothing in the two documents dealing with the question of delivery or with the intent of the parties to do an unlawful act. In Gettys *v*. Newberger, supra, where the facts were quite similar to those of this case, a verdict in favor of the broker was *directed* by the judge, and the decision was affirmed by the Circuit Court of Appeals. In that case headnote 14 holds: "To defeat a cotton broker's action against a customer for a balance due on account, on the ground that the contracts made through the broker were wagering contracts, there must be competent evidence that the parties on *both* sides had the pernicious *intention* which constitutes the contracts mere wagers, and that the *brokers* either *participated therein* or *were of that intention.*" (Italics ours.) In Mullinix *v*. Hubbard, 6 Fed. (2d) 109, where the facts were almost identical with those of the case at bar, the court held: "That no deliveries were made under contracts calling for future deliveries, but contracts were closed out by lawful and customary methods permitted by rules of New York Cotton Exchange and United States cotton-futures act, and that customer intended to close them out in such manner when he made contracts, did not make contracts illegal as wagering contracts." The court said (p. 114) : "As already stated, there was no delivery on any of these contracts, but before delivery dates were due they were all closed out by the lawful, customary, and generally prevailing methods permitted by the rules and regulations of the exchange and its clearing house, and *Bryant's intention when he made his contracts that they should be closed out in that way did not render them wagering contracts.*" (Italics ours.) In headnotes 2 and 3 of the same case it was held as follows: "2. To be illegal as gaming transaction, customer and broker must both intend, when purchase

and sale is made, that there shall be no delivery, nor lawful settlement before delivery, but merely settlement of price differences when delivery becomes due. 3. Transactions on boards of trade, where cotton, grain, and other commodities are bought and sold, are presumptively lawful and binding, and burden is on those challenging them as unlawful, as wagers, to establish such fact."

The instant case is essentially different from the cases cited by the defendant in error. The question here is whether Calhoun, the customer, carried the burden of showing that not only *he* had no intention of accepting a delivery of the cotton, but *also* that *Fenner & Beane understood* that a delivery was not to be made. The mere facts that Calhoun bought the cotton on margin for future delivery, that it was sold by the broker before the date of delivery, that in two previous transactions cotton was so sold, that Calhoun did not intend to accept delivery (it not being shown that the broker had no such intention or that it knew of Calhoun's intention not to accept delivery), are wholly insufficient to overcome the presumption of the validity of the contract, since the *undisputed* evidence discloses that Fenner & Beane had complied with all the provisions of the act of 1929. Under that act the transaction was legal, unless Calhoun showed by competent evidence that *both* parties had a mutual or common understanding that no delivery of the cotton was to be made, and this he failed to do. It follows that the general grounds of the motion for new trial showed no cause for another hearing of the case.

A special ground of the motion complains of the admission of the following documentary evidence: "Statement from Fenner & Beane, New Orleans, La., dated Nov. 24, 1934, addressed to Mr. B. R. Calhoun, Tifton, Ga., as follows: Dear Sir: In accordance with your order and our telegraphic advice we have this day made the following transactions for your account, for future delivery of cotton, subject in all respects to the by-laws, rules, and conditions of the New York Cotton Exchange, and subject to United States cotton-futures act, section five:

| "Bought | | | | Sold | |
| --- | --- | --- | --- | --- | --- |
| Bales | Delivery | Price | Bales | Delivery | Price |
| 100 | July | 12.38 | 100 | Dec. | 12.28 |
| 100 | July | 12.39 | | | |

"All orders for the purchase and sale of cotton are received and

executed with the distinct understanding that actual delivery is contemplated in accordance with the requirements of the United States cotton-futures act (section 5), and that the party giving the order so understands and agrees." The evidence was not inadmissible for any reason assigned. In Bibb *v.* Allen, supra, where the facts were substantially similar to those of the instant case, and where the same question as to the admissibility of somewhat similar documentary evidence was raised, the court said: "It is settled by the weight of authority that where a principal sends an order to a broker engaged in an established market or trade, for a deal in that trade, he confers authority upon the broker to deal according to any well-established usage in such market or trade, especially when such usage is known to the principal, and is fair in itself, and does not change in any essential particular the contract between the principal and agent, or involves no departure from the instructions of the principal; provided, the transaction for which the broker is employed is legal in its character, and does not violate any rule of law, good morals, or public policy. We are of the opinion, therefore, that the assignment of error based upon the admission of this testimony is not well taken." The remaining grounds of the motion were without merit. The verdict in favor of the plaintiff being demanded by the undisputed evidence; and no error of law having been committed on the trial, the grant of a new trial, although the first grant thereof, was error.

*Judgment reversed. MacIntyre, J., concurs. Guerry, J., dissents.*

GUERRY, J., Dissenting. Fenner & Beane brought an action against B. R. Calhoun for recovery of $444.94 on a margin account for 200 bales of cotton. The court directed a verdict for the plaintiff. The court granted the defendant a new trial, and on this judgment the plaintiff assigns error. This being the first grant of a new trial, the judgment should be affirmed, unless the evidence demanded a verdict for the plaintiff. The defendant contends that the alleged debt arose out of a cotton-futures contract between the plantiff and the defendant upon proper margins, that there was no intention that the cotton should actually be delivered, but that settlement was to be·made according to the market price of the cotton, and that such a contract is a gaming contract, unlawful, and unenforceable. Defendant contends further that there was some evidence to show that there was no intention that the cotton

should be delivered, and for this reason the court erred in directing the verdict, and therefore, properly granted the new trial.

The Code, § 20-603, declares: "Any contract of sale for future delivery of cotton, grain, stocks, or other commodities, where it is not the bona fide intention of parties that the things mentioned therein are to be delivered, but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, without any actual bona fide execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution, in accordance with the rules thereof, shall be null and void and unenforceable in any court, and no action shall be maintainable thereon at the suit of any party." See also § 20-602. The quoted section is a codification of part of the act of 1929; and under that act, as well as preceding acts, if the contracting parties intend that there shall be no delivery, the contract is unlawful and unenforceable.

The record shows that the cotton in question was bought on margin for future July delivery, 1935; and that the cotton was sold, or contract closed out by the plaintiff, on March 11, 1935, without the knowledge of the defendant, and without calling on the defendant for more margin. The defendant testified, in part: "I did not at any time have any cotton delivered on current contracts. . . I have been engaged with Fenner & Beane in the futures market since 1933. I have never settled any contract except on margin. . . These contracts were made with Fenner & Beane through Mr. Greene. Lots of time they were made on the telephone. I would call him up, or he would call me up and tell me that he thought cotton would be a good buy. . . I do not operate a cotton mill, and have no use for a hundred bales of cotton. I just put the contracts up to win or lose. Each contract that I bought I had to put up $500, and on numerous occasions they closed out the contracts and left me in the hole. There was never any occasion when I purchased a contract that they did not require me to put up a margin. . . The July cotton they bought —it was sold without any direction from me. . . With respect to the contracts—they would never reach maturity—they would always call me up and tell me they had closed it out at a certain time, at a certain date. In fact that's why I didn't bother about

this one. The only way it was done was by margin—the contracts never reached maturity. . . Not the slightest expression of intention was made between Mr. Greene and myself at the time we entered into this account for cotton futures, . . and as to receiving the cotton, I did not have any use for it at all." J. M. Greene, a witness for the plaintiff, and the representative of the plaintiff with whom the defendant dealt, when asked if delivery was contemplated, did not say that he or his firm intended for delivery to be made, but merely stated, "That subject was never discussed." The evidence also shows that when the cotton was bought, the deal was made with Anderson, Clayton & Fleming, *futures commission brokers.*

The issue presented to this court for decision is not whether the evidence would authorize a verdict for the plaintiff, or who had the burden of proving the contract illegal. Conceding that there was some evidence that would authorize a verdict for the plaintiff, that the defendant had the burden of proving that the contract was illegal, and that to render this contract illegal it must be shown that both parties intended that there should be no delivery of the cotton, the sole question for decision of this court is, was there *any evidence,* regardless of who adduced it, to show that the parties did not intend actual delivery of the cotton? If the parties intended that the cotton should not be delivered, then the contract is unlawful and unenforceable; and if there is *any evidence* to show that the parties did not intend for delivery to be made, then the case should go to the jury for the determination of this *issue of fact.* I think there is some evidence to show that both parties understood and intended that this was a mere wagering or gambling contract. The evidence shows that the cotton was bought *on margin* for future delivery, and was sold without calling on the defendant for more margin. This, though not conclusive, is at least a matter to be considered by the jury. The evidence also shows that the defendant had been engaged in the futures market with the plaintiff since 1933, during which time he had bought numerous contracts, and that during all this time no delivery had ever been made, which tends to show an established custom between the parties which they both understood. The evidence also shows that Mr. Greene, the representative of the plaintiff, would call the defendant on the telephone and tell him "that he thought cotton

would be a good buy," and this would at least indicate that the parties understood that their dealings were of a gambling nature. The fact that the defendant did not operate a cotton mill, had no use for a hundred bales of cotton, and "just put the contracts up to win or lose," certainly indicated a gambling contract.

In *Anderson* v. *Holbrook,* 128 *Ga.* 233, 236 (57 S. E. 500, 11 L. R. A. (N. S.) 575), where the petition of the brokers was being tested as against a demurrer, the court held that the petition was subject to demurrer, and that "If a broker was privy to wagering contracts for fictitious or option futures, and brought the parties together for the very purpose of entering into such illegal agreements, he could not recover for advances made by him on account of his principal in forwarding such illegal contracts." In the opinion in that case the court said: "Pleadings are to be taken most strongly against the pleader. But it is scarcely necessary to invoke this rule in order to see from the terms of the petition that the transactions here involved belonged to that class of gambling contracts commonly known as dealings in futures. We think the plaintiff's own pleading is sufficient to make this apparent even to those who claim no intimacy with the ' bull ' rings and ' bear ' pits of finance. A man residing in a small country town in Hart county gave orders to brokers in the City of Atlanta, covering a somewhat widely diversified list of objects, such as ' Jan. cotton,' ' Dec. oats,' ' Jan. ribs,' ' Ma. wht.,' ' 10 C. F. I.,' ' 10 U. P.,' and 190 shares of stock. The brokers dealt with a corporation in a distant city as to a part of the transaction, and as to the balance it does not appear with whom they dealt. The allegations do not disclose that these were purchases for actual delivery (save a general reference in the rejected amendment as to delivery of cotton), or the amount of purchase-money paid or to be paid. It seems quite clear that the whole matter was simply a speculation in futures, a putting up of margins ' to keep the trades afoot,' a requirement of more margins when the market declined, and a failure to put up such margins, by reason of which ' the transactions were necessarily closed out.'" In *Luke* v. *Livingston,* 9 *Ga. App.* 116, 120 (70 S. E. 596), it was said: "It is true, . . an unlawful intent must be present in the minds of both parties; but the intent can be shown by circumstances. It will be for the *jury* to say, when they have heard all the circumstances, *what was the*

*spirit which moved the making of this contract.* Did the parties when they made it *really understand, contemplate, and believe that actual cotton would be bought by one person,* and not merely tendered, *but actually delivered to the other,* irrespective of whether the market was above or below the price fixed in the contract? Or did they have in mind that if the price named in the .contract happened to be the market price, the cotton might be delivered, while, if the market price were different, the parties would probably not go through the form of delivering the cotton, but would settle their differences in money, without any transfer of the cotton taking place? If the seller is a farmer raising cotton, and the buyer is one who has use for cotton, such as a spinner or an exporter, the inference that the actual delivery of the cotton was contemplated would be much more readily indulged than it would be if the parties occupied no such relationship." (Italics mine.) In the instant case the buyer was not a spinner or exporter, and testified that he had no use for the cotton. The case of James *v.* Clement, 223 Fed. 385, decided by Judge Pardee, is to my mind controlling, and is not varied by the act of 1929. Judge Pardee said: "We do not understand that the contention is made that the New York Cotton Exchange does not afford convenient facilities for carrying on gambling operations in cotton futures. The evidence in this case shows conclusively that a very small percentage of the immense number of contracts made on that exchange for the future delivery of cotton result in an actual delivery of any cotton. If such a venture is entered upon and prosecuted between the principal and his broker, by whose agency the transaction is carried on, that no delivery or receipt as the case may be, is expected to occur, but the dealing is to be concluded by the payment or receipt of the differences between the contract price and the market price at the time of settlement, the transaction is a wagering or gambling one, *and is rendered none the less such a one by the circumstance that it is carried on by means of contracts which on their face call for actual delivery or receipt of cotton.* Bibb *v.* Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. ed. 819." (Italics mine.)

If the contract in this case was a gambling contract, it is an illegal contract under the act of 1929, p. 245 (Code, §§ 20-601 to 20-606, inclusive). Sections 4257 through 4264 of the Code of 1910 were expressly repealed. Sections 4253 and 4256 of the

Code of 1910 (Code of 1933, §§ 20-504, 20-505) were not repealed, and under such sections a contract for the future delivery of cotton, made merely to speculate in differences and the rise and fall of prices, without any intention to deliver or receive cotton, is void as a gaming contract not only under the unrepealed sections quoted above, but under the general law as announced by the United States Supreme Court. See Waldron v. Johnson, 86 Fed. 757. The Code, § 20-602, which is a codification of the act of 1929, declares that all contracts "where it is not contemplated by the parties thereto that there shall be an actual delivery of the commodities bought or sold shall be unlawful." In Cunningham v. National Bank of Augusta, 71 Ga. 400 (51 Am. R. 266), this language was used: "But what is the transaction termed ' futures '? It is this: one person says that I will sell you cotton at a certain time in the future for a certain price; you agree to pay that price, knowing that the person you deal with has no cotton to deliver at that time, but with the understanding that when the time arrives for delivery you are to pay him the difference between the market value of that cotton and the price you agreed to pay, if cotton declines; and if cotton advances, he is to pay you the difference between what you promised to give and the advanced market price." In Hutchinson v. Brown, 47 Ga. App. 82 (169 S. E. 848), this language was quoted approvingly from the cases there cited: "Where a broker is privy to such a wagering contract, and brings the parties together for the very purpose of entering into the illegal agreement, he is particeps criminis, and can not recover for services or losses incurred by himself in forwarding the transaction." The evidence for the plaintiff in the instant case shows that Anderson-Clayton Company are spot dealers in cotton, and that Anderson, Clayton & Fleming, the parties with whom Fenner & Beane dealt in handling the transaction, were "futures commission brokers." Under the act of 1929, which was passed by the legislature after the Supreme Court had decided the case of Layton v. State, 165 Ga. 265 (140 S. E. 847), Fenner & Beane, by complying with the provisions of that act, would absolve themselves from criminal prosecution in handling transactions of this character; but the obligation, so far as civil actions are concerned, remains the same. What is the intention of the parties may be shown by the circumstances as well as by the sayings. "Acts speak

836

louder than words" is sometimes applied by the courts, as will be noted in the opinion of Judge Pardee above quoted. I think there were enough evidence and circumstances to make an issue for the jury on the question of fact as to whether delivery of the cotton was intended by the contracting parties; and that the court, after directing a verdict for the plaintiff, properly granted a new trial. In my opinion, the verdict was not demanded; and since the learned trial judge was dissatisfied with his direction of a verdict, and granted a new trial for the first time, this court, under numerous decisions of both our appellate courts, should not interfere.